Filed 1/17/14; pub. order 2/4/14 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL W. MORGAN et al., | D060146, D061087 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. ECU04936 ) |
| IMPERIAL IRRIGATION DISTRICT, | |
| Defendant and Respondent; | |
| IMPERIAL COUNTY FARM BUREAU, | |
| Real Party in Interest and Appellant. | |

APPEALS from a judgment and postjudgment order of the Superior Court of Imperial County, Rick S. Brown, Judge. (Retired Judge of the Santa Barbara Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Judgment affirmed; order reversed.

Law Offices of Patrick J. Maloney, Patrick J. Maloney, Thomas S. Virsik; Law Office of Cressey H. Nakagawa and Cressey H. Nakagawa for Plaintiffs and Appellants.

Nossaman, Frederic A. Fudacz; Allen Matkins Leck Gamble Mallory & Natsis, Mark J. Hattam, Kathryn D. Horning; Walker & Driskill and Mitchell A. Driskill for Defendant and Respondent.

California Farm Bureau Federation, Nancy N. McDonough and Christian C. Sheuring for Real Party in Interest and Appellant.

In this consolidated appeal, Imperial County Farm Bureau (Farm Bureau), Michael Morgan, John Elmore, and Walter Holtz (Morgan, Elmore, and Holtz collectively the Individuals) contend the trial court erred in determining that the Imperial Irrigation District (District) complied with Proposition 218 (Cal. Const., art. XIII D) in its passage of new water rates. Also, the District appeals a postjudgment order awarding the Individuals attorney fees under California's private attorney general statute, Code of Civil Procedure section 1021.5.

The District provides water to the Imperial Valley. Its customers use the water for a variety of purposes, including agricultural, municipal, industrial, and residential. The District charges varying rates depending on its customers' use of the water. In 2008, the District, after holding a protest election, increased rates for water usage for many of its customers. However, the rates differed among types of customer, creating rate classes. Farm Bureau argues Proposition 218 required the District to conduct a separate protest election for each different rate class the District sought to impose, rather than the omnibus protest election the District conducted, which considered the entire rate scheme. We disagree.

2

We see nothing in section 6 of article XIII D of the California Constitution[1] that prohibits the District from holding a single protest election for a collection of rate increases involving all its customers.  Further, if we were to adopt the interpretation Farm Bureau urges, a minority of the customers could prevent any increase of their water rates and call into question the proposed rates for the remaining customer classes without regard to the desires of the majority of the customers as a whole.  There is no support for such proportional voting in section 6.

The Individuals join Farm Bureau's argument, but also advance their own claims that the District failed to meet both the substantive and procedural requirements of Proposition 218.  We conclude the Individuals forfeited some of their claims by failing to raise the issues with the trial court in the first instance.  For the surviving challenges, the Individuals ask this court to reweigh evidence to ascertain if the District complied with the substantive requirements of section 6.  This we cannot do.  In addition, on the record before us, we determine the District satisfied section 6's substantive requirements.

Like their challenges involving section 6's substantive requirements, the Individuals' claims that the District did not comply with the procedural requirements of section 6 are without merit.  Because we determine that neither challenge to the District's increase of water rates is well taken, we affirm the judgment.

---

[1]     Unspecified references to sections are to sections of article XIII D of the California Constitution.

3

Finally, we see no basis on which to award the Individuals their attorney fees under Code of Civil Procedure section 1021.5. On the record before us, there is no substantial benefit the Individuals conferred on the public by virtue of their litigation. We thus reverse the order awarding attorney fees.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### *The District*

The District's water service area is located in the Imperial Valley, which is situated between the Colorado River and Arizona on the east, Mexico on the south, Riverside County and the Salton Sea on the north, and San Diego County on the west. (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 784.) All people in the Imperial Valley rely on the District for their water and power. (*Choudhry v. Free* (1976) 17 Cal.3d 660, 663.) Indeed, the District is the sole source of fresh water for the Imperial Valley, which comes from the Colorado River. (*Quantification Settlement Agreement Cases*, *supra*, at p. 784.) Its customers use the water for a variety of purposes, including agricultural, municipal, industrial, and residential. The District provides irrigation water and drainage for about 475,000 acres of farmland while also supplying water to cities and other users. To deliver water to its customers, the District maintains and operates an extensive delivery system that includes the All American Canal, almost 1,700 miles of other delivery canals, and laterals going to thousands of headgates,

---

[2]    We note the Association of California Water Agencies filed an application for permission to file an amicus curiae brief on behalf of the District. After reviewing the record and in light of our opinion affirming the judgment below in favor of the District, we conclude the filing of any amicus curiae brief or any other brief unnecessary.

numerous reservoirs, and over 1,400 miles of drainage ditches. The District delivers an average of 6,700 acre-feet of water on a daily basis.[3]

*The Setting of New Water Rates*

After several years of operating deficits in the District's water department and a forecast of continuing budget deficits, the District's Board decided to review its water rates. In February 2008, the District hired Entrix, Inc. to conduct a water rate cost of service study. The Entrix cost of service study (Cost of Service Study) is an analysis of the costs of providing services to District customers. It used historical costs and projection of future costs to determine revenue requirements that needed to be recovered by the water rates. The primary goal of the Cost of Service Study was to "equitably allocate costs among customer classes in proportion to the services provided to each."

In preparing the study, Entrix used certain guiding principles including that, "[r]ate structures should be designed to ensure that users pay only their proportionate share of costs." The Cost of Service Study developed its revenue requirements on a six-year timeframe that encompassed 2009 through 2014. Entrix focused on the District's cash needs to provide water service, which included operations, maintenance, debt service reserves, and cost of capital expenditures. Entrix, however, only considered water rate related costs and revenues. The Cost of Service Study was "based strictly on cost-of-service principles, and [did] not consider any principles of value-of-service pricing . . . ."

---

[3] An acre-foot of water is enough to cover one acre of land one-foot deep. (*Central and West Basin Water Replenishment Dist. v. Southern California Water Co.* (2003) 109 Cal.App.4th 891, 900, fn. 5.)

It followed commonly accepted professional standards developed by the American Water Works Association (AWWA) for cost of service studies.

The Cost of Service Study took into account the character of the District and its customers. Most of the District's water system and its water delivery costs are shared by all users, and the study thus allocated costs to all users. However, some types of service require extra costs, and therefore, the study allocated those costs only to the corresponding more expensive services. For example, small pipe and small parcel accounts have particularized costs for repairs and maintenance and Entrix calculated a rate for these accounts that had to bear these special costs. Similarly, municipal and industrial users create special costs so their charges are higher per acre foot than agricultural users. Entrix considered this and similar information in preparing the Cost of Service Study.

Entrix determined that almost all of the actual District water rates were too low to meet the District's actual cost of service. Because there was a considerable gap between what the District was charging and what it needed to charge customers to cover the actual costs of its water service, the Cost of Service Study noted there might be practical difficulties in raising water rates immediately to close the gap. Thus, in the Cost of Service Study, Entrix developed three possible rate structure formats for the District's Board to consider: a single uniform water rate change for the whole period of the study to cover costs; annual water rate changes that attempted to cover costs each year as best as possible; and a phased rate change that started rates low in early years but then moved

6

up significantly over time to cover costs. Each method was expected to reduce the cost deficit to $0 over the six-year period

The Cost of Service Study excluded certain classes of service that existed in the District's billing system, but for which there were no actual paying accounts and use data. The Cost of Service Study also pointed out that the District's untreated water rate was far below that of other public agencies in California.

Entrix did not have perfect data on which to base the Cost of Service Study. For example, the District lacked particularized volumetric use data for the pipe and small parcel and wholesale tier 2 customers. Therefore, Entrix used information from the District's staff to estimate the amount of water used by these customers annually. In addition, these estimates are buttressed by data published by the AWWA, water use data for local municipalities, and local evapotranspiration rates. Such method of average use calculation was utilized for any category of service to which the District did not have clear measurement data.

Additionally, prior to the current rates set by the District, it had certain free accounts for nonprofits, such as schools, cemeteries, and churches. In the Cost of Service Study, Entrix recommended that the District discontinue these accounts. The District followed this recommendation in its new rate structure.

The Cost of Service Study was explained to the public in a workshop on March 17, 2009. In that presentation, Entrix explained in general terms the Cost of Service Study and the potential rate structures developed from it. Though Entrix's scope of work allowed it to make final minor edits to the Cost of Service Study after the

7

workshop if necessary, there is no indication in the record that Entrix made any additional changes. As such, the February 13, 2009 Cost of Service Study was the final version of that study.

*The Rate Change Notice*

On February 19, 2009, the District mailed proposed rate notices in both English and Spanish to all affected property owners. The District took great care to ensure that it had an accurate list of all its customers. The rate notices provided the rates that were being proposed for the District water service and referenced the District rate regulations, the basis for the new charges, and description of the Cost of Service Study, including a website that would allow customers to review the study. The rates provided in the notice were generally the ones recommended by the District's finance department based on the Cost of Service Study annual rate, but less than the amounts called for in the Cost of Service Study's single uniform rate. Because the exact amounts that might be charged to a specific customer were unknown given that the rates were mainly for amounts of water consumed, the District provided average impact examples.

The notice informed the District's customers that they had the right to protest the rate increases and explained the protest procedure. The notice included a protest form. Additional protest forms were available at the District headquarters and on the District's website. The notice set forth the time and location of the hearing (5:00 p.m. on April 7, 2009 at the William Condit Auditorium) on the proposed rate increase where the protest votes would be counted.

*The Protest Process*

The protest forms requested property owners and tenant customers to identify the assessor's parcel number (APN), the District account number, and canal-gate-field (CGF) designation for each parcel being protested and identify the person or entity submitting the protest. The protest notice indicated where, how, and when the protests were to be submitted.

To allow for the greatest meaningful participation in the protest by all District water service customers, the District determined that protests would be considered by the CGF designation as a "parcel" because the District generally delivers water to particular fields at gates. Water delivery points within the District service area received CGF designation as provided on water bills. Each CGF designation was related to the APN at that CGF location.

There were 9,929 unique CGF parcels and 12,642 unique APNs. Each owner or tenant customer had the opportunity to submit a protest. The District counted every protest that was properly submitted by an owner or tenant customer of a CGF parcel or APN. The District liberally applied the rules so as to give as much opportunity for protest as possible. For example, a protest was accepted even if it technically violated the rules by not being turned in at the correct location, or it contained the wrong APN or CGF designation or had invalid account numbers, as long as the District could determine the correct information. If only one gate was listed, and no fields (multiple fields may be served by one gate) then the District counted protests for all the fields served by that gate.

Generally, the District attempted to correct the errors so the maximum number of protests could be counted.

The protests by owners/tenants were then counted by parcel per section 6 and Government Code section 53755, subdivision (b). Of the 9,928 CGF parcels, 4,018 of the parcels protested, a 40.47 percent protest rate. Of the 12,642 APNs, 3,950 parcels protested, a 31.25 percent protest rate. Therefore, under either method of parcel description, the protests did not pass the 50 percent threshold.

*The District's Board Action*

After the District staff counted the protests, the results were explained to the District Board. The District's general counsel noted that the Board could pass rates lower than those that were noticed, but not higher rates.

The District Board discussed the rates at length. Included in the discussion were concerns about: (a) raising agricultural rates; (b) municipal rates having already been increased significantly in 2005; and (c) other sources of possible income and cost-cutting. Ultimately, the board decided to increase the rates, except for municipal, which had been raised more recently, and industrial rates, which was the subject of further study tied to the integrated water resource management plan. Because the District's Board decided to not immediately raise the general agriculture rate to the $20 per acre-foot contained in the mailed, written notice, but to instead start at $18 per acre-foot and move to $20 gradually, the related rates that tiered off that agricultural rate were adjusted accordingly.

On July 21, 2009, the results of the rate protest were presented to the District Board and the Board adopted the water rate increases.

10

*The Litigation*

The Individuals and Farm Bureau filed their initial complaint in case No. ECU04936 on January 16, 2009. The complaint was amended after the mailing of the notices of the proposed rate change. The first amended complaint included allegations that the District's written notice and protest forms were defective, the protest procedure was improperly conducted, plaintiffs were entitled to information concerning potential protesters in any proceeding under sections 4 or 6, and the Cost of Service Study was defective.[4]

On September 21, 2009, Plaintiffs commenced a new action in case No. ECU05549. The complaint in that action echoed the same allegations in the operative complaint in case No. ECU04936.[5] In addition, plaintiffs also added three new causes of action alleging that the District had improperly counted the protests.

The parties stipulated to consolidate case No. ECU05549 with case No. ECU04936 with the operative complaint becoming the complaint from the latter filed case.

The case was tried via bench trial on April 13 and 14, 2011. At the conclusion of the proceedings, the trial court announced its rulings, and on June 16, 2011, the court

[4] The original complaint and the first amended complaint also included several causes of action aimed at Resolution 22-2008, in which the District adopted a revised equitable distribution of water plan (EDP) that included a $20 per acre-foot "unused water" fee and a $1 per acre-foot "administrative fee." The EDP is not relevant to the Farm Bureau's or the Individuals' respective challenges to the District's water rate increases, but will be discussed below in the context of the court's award of attorney fees.

[5] The allegations included claims against the EDP.

filed a pleading entitled "Statement of Decision After Hearing and Order Thereon" (statement of decision). In regard to the rate changes and the District's process for approving those rate changes, the court found: (1) the written notice of the proposed rate changes complied with section 6; (2) the new rates were not disproportionate to the cost of service; (3) plaintiffs were not entitled to the roll of protestors; (4) the Cost of Service Study was not defective; (5) there was no impropriety in the protest procedure; and (6) minor variations between the proposed and adopted water rates did not invalidate the Cost of Service Study or render the new rates disproportionate to the cost of providing service.[6]

On June 20, 2011, the District filed a notice of entry of judgment with the statement of decision attached. The Individuals and Farm Bureau timely appealed.

DISCUSSION

I

*APPEALABILITY OF THE STATEMENT OF DECISION*

There is no indication in the record that the court ever entered judgment following the statement of decision. "The general rule is that a statement or memorandum of decision is not appealable. [Citations.] The rule's practical justification is that courts typically embody their final rulings not in statements of decision but in orders or judgments. Reviewing courts have discretion to treat statements of decision as

---

[6] The statement of decision also addressed the claims against the EDP plan. Those claims were dismissed based on a stipulation between the parties. The substance of the stipulation will be discussed in the attorney fees section below.

12

appealable when they must, as when a statement of decision is signed and filed and does, in fact, constitute the court's final decision on the merits." (*Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 901.) Here, the statement of decision included a section entitled "Order on Causes of Action asserted by Plaintiff, Interested Party." This section addressed every cause of action asserted in the operative complaint and either dismissed them as moot or adjudicated them in favor of the District. The court clearly intended the statement of decision to constitute its final decision on the merits. No party argues otherwise. As such, we exercise our discretion and treat the statement of decision as the appealable, final judgment in this matter. (*Ibid*.; see *Griset v. Fair Political Practices Commission* (2001) 25 Cal.4th 688, 698; *Jacobs-Zorne v. Superior Court* (1996) 46 Cal.App.4th 1064, 1070.)

II

*PROPOSITION 218*

Proposition 218 is a further limitation on government's imposition of taxes that began with the adoption of Proposition 13 in 1978. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 442-443 (*Silicon Valley*).) It created a new category of property-related fees subject to its provisions. (§ 2, subd. (e) [" 'Fee' or 'charge' means any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service."].) Proposition 218 limits the imposition of taxes, assessments, or fees on property or on people as an incident of property ownership except as authorized. (§ 3.) As relevant to

13

the issues raised here, it established new procedural and substantive requirements for the imposition of property-related fees. (§ 6, subds. (a), (b).) It also shifted to agencies the burden to demonstrate the lawfulness of the challenged fees. (§ 6, subd. (b)(5).)

## A. The Required Protest Procedure

Farm Bureau's primary contention, joined by the Individuals, involves the protest procedures the District used in allowing its customers to disapprove of the proposed rate increases. Farm Bureau argues that section 6 requires the District to use individual fee protest procedures. Farm Bureau reasons that because the District proposed different rate increases across its spectrum of customers, each rate increase should have been subject to its own, separate protest process with only those customers voting who would be affected by the specific rate increase. Thus, according to Farm Bureau, the District should have calculated whether a majority of the customers protested the rate increase based on each individual protest group or rate class. The District counters, asserting that section 6 permits the protest process used here, namely an omnibus procedure where all its customers were permitted to vote on a new system of rate increases. To resolve this dispute, we must interpret section 6.

Ordinarily, "[r]ules of construction and interpretation that are applicable when considering statutes are equally applicable in interpreting constitutional provisions." (*County of Fresno v. Malmstrom* (1979) 94 Cal.App.3d 974, 979.) "The interpretation of a statute . . . is a question of law, and we are not bound by evidence presented on the question in the trial court." (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.) "When interpreting a provision of our state

14

Constitution, our aim is 'to determine and effectuate the intent of those who enacted the constitutional provision at issue.' [Citation.] When, as here, the voters enacted the provision, their intent governs. [Citation.] To determine the voters' intent, 'we begin by examining the constitutional text, giving the words their ordinary meanings.' [Citation.]" (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 212 (*Bighorn-Desert*).) " 'When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it.' [Citations.]" (*People v. Benson* (1998) 18 Cal.4th 24, 30, quoting *People v. Overstreet* (1986) 42 Cal.3d 891, 895.) "If 'the terms of a statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.' [Citation.]" (*People v. Hazelton* (1996) 14 Cal.4th 101, 105, quoting *People v. Coronado* (1995) 12 Cal.4th 145, 151.)

Citing *Bighorn-Desert*, *supra*, 39 Cal.4th 205 and *City of Palmdale v. Palmdale Water District* (2011) 198 Cal.App.4th 926 (*Palmdale*), the District argues that our high court and at least one Court of Appeal have already approved of rate proposals similar to the one at issue here (i.e., a single proposal involving multiple rate increases). However, neither the court in *Bighorn-Desert* nor the court in *Palmdale* addressed the constitutionality of an omnibus protest procedure involving a system of rate increases. While the rate increases in both of those cases did involve multiple rates, no party challenged the rate increase on the grounds that individual protest procedures for each rate class must be used when an agency plans to increase multiple rates as part of a rate plan for all its customers. It logically follows that neither court addressed or even

15

discussed the impact of the multiple rate increases on the protest procedure.  As such, *Bighorn-Desert*, *supra,* 29 Cal.4th 205 and *Palmdale*, *supra*, 198 Cal.App.4th 926 do not provide guidance on the issue before us here.  (See *Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 348 ["A decision, of course, is not authority for what it does not consider."]; *In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [" 'It is axiomatic that cases are not authority for propositions not considered.' [Citation.]"].)  Instead, we deem the issue raised by Farm Bureau a matter of first impression.

We begin our task by reviewing the entirety of section 6.  In doing so, we are mindful that we " ' "must enforce the provisions of our Constitution and 'may not lightly disregard or blink at . . . a clear constitutional mandate.' " ' "  (*State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 523.)  "In so doing, we are obligated to construe constitutional amendments in a manner that effectuates the voters' purpose in adopting the law."  (*Silicon Valley*, *supra*, 44 Cal.4th at p. 448.)  As our Supreme Court explicitly noted, "Proposition 218 specifically states that '[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting the local government revenue and enhancing taxpayer consent.' [Citation.]"  (*Silicon Valley*, *supra*, at p. 448.)  Thus, we interpret Proposition 218, specifically section 6, with these purposes in mind.

Section 6 does not explicitly state that an agency must use individual protest procedures, holding separate protest votes for each rate class as urged by Farm Bureau. Instead, section 6's procedural requirements are more general.  For example, section 6, subdivision (a) requires an agency to comply with the following procedures prior to

16

implementing any fee increase: (1) identify the parcels on which a fee is proposed; (2) calculate the amount of the fee; and (3) provide written notice by mail of the proposed fee to the record owner of each identified parcel. (§ 6, subd. (a)(1).) The written notice must provide the amount of the fee proposed upon each parcel, the basis upon which the proposed fee was calculated, the reason for the fee, and the date, time, and location of the public hearing on the proposed fee. (*Ibid*.)

Section 6 also provides guidance regarding the protest procedure. Not less than 45 days after mailing the notice, the agency shall conduct a public hearing regarding the proposed fee. At this hearing, the agency must consider all protests against the proposed fee. If a majority of the owners of the identified parcels present written protests to the fee, the agency cannot impose the fee. (§ 6, subd. (a)(2).) Section 6 offers no other instructions regarding the procedural requirements of holding a protest vote.

Farm Bureau focuses on section 6, subdivision (a)(2)'s use of the word "fee" in the singular ("the proposed fee" and "the fee").[7] Farm Bureau contends that the use of the singular "fee" indicates that a "citizen [has] the right to protest a fee or charge proposed for application to his land, along with similarly situated citizens." Farm Bureau therefore concludes section 6, subdivision (a)(2) "is not written to allow a global right of majority

---

[7] Section 6, subdivision (a)(2) provides: "The agency shall conduct a public hearing upon the proposed fee or charge not less than 45 days after mailing the notice of the proposed fee or charge to the record owners of each identified parcel upon which the fee or charge is proposed for imposition. At the public hearing, the agency shall consider all protests against the proposed fee or charge. If written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge."

17

protest against a suite or bundle or package of fees, or against a rate structure, or anything besides a 'fee' or 'charge.' "  Farm Bureau's argument relies too heavily on the use of the word "fee."

As the District points out, under the general rules of statutory construction, the use of a word in the singular from is interchangeable with the use of the word in the plural form.  (See *Division of Occupational Safety & Heath v. State Bd. of Control* (1987) 189 Cal.App.3d 794, 807, fn. 9 ["Notwithstanding the use of the plural ('standby persons'), a general rule of construction is that words used in the singular include the plural and vice versa."].)  Thus, the use of the word "fee" in section 6, subdivision (a)(2) is not solely determinative of whether a fee-by-fee protest procedure is required for the rate increases at issue here.

Further, we see nothing in the language of section 6 mandating an agency to hold "individual protest elections" for "similarly situated citizens" as urged by Farm Bureau. Instead, the requirements are very general regarding the timing of the public hearing and considering all protests.  In terms of counting protests, section 6 prohibits an agency from increasing a fee if a majority of the owners of the identified parcels present written protests to the fee.  It is not clear from this language if the "identified parcels" are limited to parcels that will be subject to the same exact rate change or all the parcels identified as part of the entire new rate system.

Although the procedural requirements of section 6 do not definitively answer the question before us, that section's substantive requirements shed further light on an appropriate protest procedure.  Section 6 provides that revenues derived from the fee

18

cannot exceed the funds required to provide the property-related service. (§ 6, subd. (b)(1).) The funds arising from the fees may not be used for any purpose other than that for which the fee was imposed. (§ 6, subd. (b)(2).) The amount of the fee imposed on any parcel or person as an incident of property ownership cannot exceed the proportional cost of the service attributable to the parcel. (§ 6, subd. (b)(3).) No fee may be imposed for a service unless that service is actually used by, or immediately available to, the owner of the property in question. (§ 6, subd. (b)(4).) A fee may not be imposed for general government services where the service is available to the public at large in substantially the same manner as it is to property owners. (§ 6, subd. (b)(5).)

Of these substantive requirements, two stand out as the most pertinent to our discussion of the permitted protest procedure: the total cap in funds raised and the proportionality requirement. These two conditions work together to ensure the agency collects only enough to cover its costs, and within that overall cost structure, only charges each customer his or her "fair share" on a proportional basis. These requirements are a constitutional mandate that an agency apply a general cost of service principle in setting any potential rate or rate increase.

Within this framework, it is clear that section 6 contemplates customers paying different amounts. The cap requirement limits the total amount that an agency may collect. However, within that total amount, section 6 requires that each customer only pay his or her proportional share. Put differently, the proportionality requirement ensures that the aggregate fee collected on all parcels is distributed among those parcels in proportion to the cost of service for each parcel. (Cf. *Beutz v. County of Riverside* (2010)

19

184 Cal.App.4th 1516, 1522 (*Beutz*) [discussing § 4].) There is nothing in section 6 that prohibits an agency from charging different rates to its customers as long as the fees paid by customers are proportional and the total amount the agency collects does not surpass the cost of providing the service. These substantive requirements help section 6 achieve the voters' objective of limiting the local government revenue. (See *Silicon Valley*, *supra*, 44 Cal.4th at p. 448.)

We also are mindful that section 6 is intended to enhance taxpayer consent. (*Silicon Valley*, *supra*, 44 Cal.4th at p. 448.) The protest procedure offered in section 6, subdivision (a)(2) achieves this goal by allowing owners of the identified parcels to vote against the rate increase. Government Code section 53755 mirrors the language of section 6, subdivision (a)(2): "One written protest per parcel, filed by an owner or tenant of the parcel, shall be counted in calculating a majority protest to a proposed new or increased fee or charge subject to the requirements of Section 6. . . ." (Gov. Code, §53755, subd. (b).) Although the substantive requirements of section 6 limit the fees paid by each owner of a parcel to his or her proportion of the cost of service, we see nothing in either section 6 or Government Code section 53755 indicating that the owners paying more have a larger say in any fee increase.

In contrast, section 4, which deals with assessments, specifically requires an agency to weigh each owner's vote in proportion to the amount paid by that owner. "In tabulating the ballots, the ballots should be weighted according to the proportional financial obligation of the affected property." (§ 4, subd. (e).) There is no analogous provision in section 6 despite the fact that both section 4 and section 6 anticipate that

20

citizens impacted by any assessment or fee increase could be called to pay differing amounts proportional to the cost of the special benefit conferred (§ 4) or the cost of the service provided (§ 6). The omission of proportional vote weighing in section 6 is telling. It signals that, in the context of fees, each parcel owner receives one vote weighted the same regardless of the proportional amount he or she must pay.

The omnibus protest procedure used by the District here provided each owner or tenant of each parcel affected with one equal vote. It thus complied with the mandate of section 6, subdivision (a)(2) and Government Code section 53755, subdivision (b). In comparison, the individual protest procedure urged by Farm Bureau would provide certain parcel owners with more heavily weighted votes. If this was the required procedure (allowing separate protests per rate class), not only would an agency be artificially constrained in setting rates, but the likelihood that an agency would be unable to meet its obligations to allocate costs proportionally would be heightened. If one rate class successfully objected to its portion of an agency's rates, how would the agency make up the difference in covering the cost of service given section 6, subdivision (b)(3)'s mandate that no one may be charged more than the proportional cost of the service attributable to his or her parcel? Arguably, the agency would be unable to do so, and might be forced to reduce its services to its customers to lessen costs. For certain classes of customers that depend on water for their businesses, such changes in service could prove devastating.

In addition, we are concerned that if we adopt Farm Bureau's proposed individual protest procedure, it could provide a minority of parcel owners with an effective veto of

an entire rate plan. A quick hypothetical demonstrates this point. An agency provides water to 100 parcels comprised of three different groups: single family residential customers, commercial customers, and irrigation customers. The agency calculates that the total amount of fees it needs to collect to cover the costs of providing the service is $500,000. To collect this amount, the agency further determines that single family residential customers consisting of 60 parcels would pay a rate of $3 per unit of measure; commercial customers encompassing 30 parcels would pay a rate of $5 per unit; and irrigation customers comprising 10 parcels would be a rate of $9 per unit. The agency also decides that these rates would cause each customer to pay the proportional cost of the service attributable to his or her parcel. If the agency uses an individual protest procedure as Farm Bureau argues it must, then the irrigation customers who only own 10 percent of the total number of parcels, could negate the entire proposed rate system if six of the parcels owned by irrigation customers voted against the increase. This protest procedure thus gives a minority of the parcels the power to reject any rate increase. Once the irrigation customers successfully protest their rate increase then the agency would not be able to collect the total amount of fees it deems necessary to provide service to all customers. Further, the irrigation customers' successful protest in this hypothetical also could call into question the proposed water rates for the other two customer classes. Under section 6, subdivision (b)(3), customers in the other two classes cannot pay more than their proportional share of the costs. The total costs would be altered if the agency had to reduce its services because the irrigation customers rejected their rate increase. The lower costs would make the proposed rate increases for the other customer classes

22

disproportional because they were based on the entire system of rates and the cost of service assuming those increased rates. As such, the agency would have to start over in setting a new rate structure, which could prove incredibly costly and inefficient.

We conclude the protest procedure used by the District here did not violate the procedural and substantive requirements of section 6. Our high court explained the purpose of these requirements as follows:

> "The notice and hearing requirements of subdivision (a) of section 6 of California Constitution article XIII D will facilitate communications between a public water agency's board and its customers, and the substantive restrictions on property-related charges in subdivision (b) of the same section should allay customers' concerns that the agency's water delivery charges are excessive." (*Bighorn-Desert*, *supra*, 39 Cal.4th at pp. 220-221, fns. omitted.)

Given the goals of section 6 to minimize water rates and promote dialog between rate payers and rate makers, public agencies must be permitted to reasonably structure their revenues to cover costs and meet customer needs using a rate setting process that includes notice and hearing requirements sufficient to allow meaningful public participation, but tolerably administrable and flexible to avoid needless expense and delay. The omnibus protest procedure used by the District here achieves the objectives of section 6 as described by the court in *Bighorn-Desert*, *supra*, 30 Cal.4th at pages 220 and 221. The individual protest procedure argued by Farm Bureau would create an almost unworkable system, where a minority of voters could frustrate the purposes of section 6.

23

In short, we see no support for Farm Bureau's argument that the District had to use individual protest procedures for each rate class.[8] The omnibus procedure used by the District complies with constitutional requirements and might be the only practical, efficient, and cost effective method of giving customers a vote on water rate increases while providing the agency with a workable system of achieving the cost of service principles mandated by section 6.

## B.  The District's Rate Setting

### 1.  The Individuals' Contentions

In addition to joining Farm Bureau's challenge to the District's protest procedure, the Individuals claim that the District failed to comply with many of the substantive and procedural requirements of section 6.  To this end, the Individuals maintain that the District did not abide by various substantive obligations because the Cost of Service Study:  (a) was based on incorrect standards; (b) was based on poor quality data; (c) did not prove proportionality; and (d) was never adopted in final form.  The Individuals also contend the District did not observe section 6's procedural demands because:  (1) the notice provided by the District lacked the rate classes included in the protest count; (2) protests required confusing and inconsistent data to be counted; (3) the protest process

---

8      Farm Bureau points us to portions of the Legislative Analyst's "Analysis of Proposition 218" and ballot arguments in favor of Proposition 218 to support its position that individual protests are required.  The portions quoted by Farm Bureau do not shed any light on the propriety of the protest procedure here.  They are little more than summaries of portions of Proposition 218.  Indeed, but for a mention of the protest procedure in general terms, the selections Farm Bureau provides do not offer any insight into the correct protest procedure whatsoever.

was not fully public; and (4) the protest process was at a "fatal variance" with the cost of service. Finally, the Individuals assert the District acted unconstitutionally in setting rates that differed from those in the written notices.

## 2. *Standard of Review*

The proper standard of review here is well settled. We exercise our independent judgment in reviewing whether the District's rate increases violated section 6. (*Palmdale*, *supra*, 198 Cal.App.4th at p. 933; see *Silicon Valley*, *supra*, 44 Cal.4th at p. 448.) In applying this standard of review, we will not provide any deference to the District's determination of the constitutionality of its rate increase.

Despite the clear standard of review applicable to this case, the Individuals spend several pages of their opening brief explaining this standard. They argue that an appellate court "cannot accept anything the [District] offers at face value, but must corroborate or impeach every agency assertion or conclusion." They stress that the District "bears a heavy initial burden to show it had complied with all relevant requirements irrespective of the plaintiff's complaint or theories." Citing *Beutz*, *supra*, 184 Cal.App.4th 1516, the Individuals contend, on appeal, the District must show the increased rates comply with the requirements of section 6. Namely, the Individuals assert that the applicable standard of review requires the District to prove to this court's satisfaction that the rate increases are constitutional.

The Individuals confuse the de novo standard of review with the District's burden of proof at trial. In addition, they jumble the role of the trial court with the duty of the Court of Appeal. Even when we exercise our independent judgment in reviewing the

25

record, we do not take new evidence or decide disputed issues of fact. (See *People v. Cromer* (2001) 24 Cal.4th 889, 893-894, fn. omitted ["Trial courts and juries are better situated to resolve questions of fact, while appellate courts are more competent to resolve questions of law."].) Neither *Beutz, supra*, 184 Cal.App.4th 1516 nor *Silicon Valley, supra*, 44 Cal.4th 431 hold otherwise. In *Beutz*, the Court of Appeal reversed a judgment in favor of the county on its summary judgment motion and ordered the superior court to enter judgment in favor of the plaintiff on his motion for summary judgment. (*Beutz, supra*, at p. 1538.) In doing so, the court did not make any findings of fact, but instead, "the facts adduced in support of both motions were substantially the same and undisputed." Similarly, *Silicon Valley* involved an appeal following the court granting multiple motions for summary adjudication and entering the ensuing judgment, which was affirmed by the Court of Appeal. (*Silicon Valley, supra,* at pp. 440-441.) In reversing the Court of Appeal, our Supreme Court noted that it was dealing with "undisputed facts." (*Id.* at p. 456.)

Therefore, although we use a de novo standard of review here, we do not transform into a trial court. As a court of appeal, even in exercising our independent judgment, we do not find it sufficient for an appellant merely to claim the respondent should not have been successful at trial and then the burden shifts to the respondent to prove its case in its entirety again. Instead, the appellant must frame the issues for us, show us where the superior court erred, and provide us with the proper citations to the record and case law. " ' "[D]e novo review does not obligate us to cull the record for the benefit of the appellant. . . . As with an appeal from any judgment, it is the appellant's

26

responsibility to affirmatively demonstrate error . . . by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed." [Citation.]' " (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.)

### 3. Forfeiture

As a general rule, an appellate court will not review an issue that was not raised by some proper method by a party in the trial court. (See *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 (*D.R. Horton*) [contentions or theories raised for the first time on appeal are not entitled to consideration]; *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 (*Amato*) ["It must appear from the record that the issue argued on appeal was raised in the trial court. If not, the issue is waived."].) Here, the District contends the Individuals forfeited many of their arguments because they failed to raise them to the trial court in the first instance.

The Individuals assert none of the issues have been forfeited. In their reply brief, they cite to the record where they claim the issue was raised in the trial court. A quick review of the Individuals' citations indicates that the Individuals do not fully understand the concept of forfeiture.

For example, on appeal, the Individuals argue the Cost of Service Study was based on incorrect standards, namely the study relied on standards developed by the AWWA, and the Individuals insist that the District did not prove that these standards satisfied the constitutional requirements under section 6. The citations provided by the Individuals,

27

however, do not illustrate where the Individuals made this argument at trial. Instead, the citations merely reveal where the AWWA was discussed at trial by the District. They do not indicate that the Individuals ever challenged the AWWA standards.

The Individuals apparently believe they need not have raised the validity of the AWWA standards at trial because the District had the burden to prove that its rate increases were constitutional. Although the Individuals are correct that the burden was on the District, the District did not have to anticipate every argument that the Individuals could have made. Instead, the District had to lay out the requirements of section 6 and prove that it satisfied them. The District did do so to the trial court's satisfaction. If the Individuals did not believe the District carried its burden then it should have pointed out the District's failings with the trial court. They did not do so specifically as to the AWWA standards. By waiting to raise such an issue until appeal, they have deprived both the District of the opportunity to address the Individuals' concerns and the trial court of the opportunity to resolve the issue. As such, the Individuals have forfeited their contention that the Cost of Service Study was based on an incorrect standard provided by the AWWA. (See *D.R. Horton*, *supra*, 126 Cal.App.4th at p. 685; *Amato*, *supra*, 18 Cal.App.4th at p. 1794.)

In addition, the Individuals do not show in the record where they argued that the protest process required confusing and inconsistent data to be counted. While they cite to the record in challenging the information required to make a protest, the individuals fail to provide any indication that they made this argument to the trial court. Thus, this issue

is forfeited as well. (See *D.R. Horton*, *supra*, 126 Cal.App.4th at p. 685; *Amato*, *supra*, 18 Cal.App.4th at p. 1794.)

Moreover, we find nothing confusing or unduly burdensome about the protest procedure in any event. The protest form required the APN, the District account number, and the CGF. The latter two were available on the District's water bills as noted on the protest form. The form also required the customer's name and contact information. The protest form was adequate. Further, the record indicates that even if people protested but failed to prove the required information, the District tried to remedy the error if possible.

### 4. Substantive Requirements

The Individuals also claim that the District failed to comply with certain substantive requirements of section 6. We are not persuaded.

As we discuss above, section 6 includes specific substantive requirements for any fee increase. Revenues derived from the fee cannot exceed the funds required to provide the property-related service. (§ 6, subd. (b)(1).) The funds arising from the fees may not be used for any purpose other than that for which the fee was imposed. (§ 6, subd. (b)(2).) The amount of the fee imposed on any parcel or person as an incident of property ownership cannot exceed the proportional cost of the service attributable to the parcel. (§ 6, subd. (b)(3).) No fee may be imposed for a service unless that service is actually used by, or immediately available to, the owner of the property in question. (§ 6, subd. (b)(4).) A fee may not be imposed for general government services where the service is available to the public at large in substantially the same manner as it is to property owners. (§ 6, subd. (b)(5).)

The District used the Cost of Service Study to show that it met the substantive requirements of section 6. The Individuals, however, argue the Cost of Service Study did not pass constitutional muster because (1) it was based on poor quality data, (2) it did not prove proportionality; (3) the protest process was at a "fatal variance" with the cost of service, and (4) there was no final Cost of Service Study. We reject these contentions.

The Individuals' first three assertions challenge the data relied on by Entrix to prepare the Cost of Service Study. In its simplest form, the first argument is that the District's water usage data was flawed. Thus, any calculations based on that data were defective as well. In their second argument, the Individuals insist the Cost of Service Study did not prove proportionality because the underlying data was poor and Entrix did not review or audit the quality of the data. The Individuals' third argument is less than clear in their opening brief. As best as we can discern, the Individuals assert the accounts and data provided to Entrix were different than the accounts and data used to provide written notice. The key component of all three of these arguments remains that the District's data was poor, and thus, the Cost of Service Study prepared by Entrix was fatally flawed.

In response to these three contentions, the District claims there is no requirement that its data be perfect, Entrix was not obligated to audit the District's data, and the Individuals do not properly understand the data used by Entrix and the District.

In reviewing the record, it is clear that the adequacy of the data was a vehemently disputed factual issue at trial. The Individuals challenged the validity of the data by

30

citing to a 2003 Bureau of Reclamation Part 417 Decision[9] and some observations presented by Professor Michael Hanemann at the Equitable Distribution of Water Public Workshop on July 18 and 19, 2006 (Hanemann Observations). The District, in turn, offered a detailed explanation why the Individuals misinterpreted the Hanemann Observations. Specifically, the District pointed out that the Individuals were quoting from two pages of a 69-page report dealing with the equitable distribution of water. The District further explained that the Hanemann Observations were aimed at what methodology the District should use to apportion water during a supply/demand imbalance and did not indicate that the District's data regarding the amount of water delivered was inaccurate. The trial court found the District's explanation more credible than the Individuals' contention.

In addition, we note there exists other evidence in the record showing the District's data was reliable. For example, the system improvement study performed by Natural Resources Consulting Engineers shows the District's data was reasonably dependable and adequate.

Entrix relied on the District's data when preparing the Cost of Service Study. The trial court found the Cost of Service Study "to be very thorough and it was not defective." Thus, based in part on the District's reliance on the Cost of Service Study, the trial court

---

9    The Individuals mentioned this decision in their opening brief and we found a reference to it in the record, but the actual decision is not in the record. Also, the Individuals did not refer to the decision during trial.

31

concluded that the District satisfied the substantive requirements of section 6 in approving the rate increases.

Although the Individuals do not couch it as such, they are challenging the sufficiency of the evidence. In this regard, we review the trial court's resolution of factual conflicts under the substantial evidence standard. (*People v. Mickey* (1991) 54 Cal.3d 612, 649; *Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585.) Under this standard, "the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Grainger v. Antoyan* (1957) 48 Cal.2d 805, 807; italics omitted.) Our review is not limited to appraising " 'isolated bits of evidence selected by the [appellant].' " (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.) We are required to accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the verdict. (*Minelian v. Manzella* (1989) 215 Cal.App.3d 457, 463.) Thus, it is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766; see *Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

As a threshold matter, the Individuals fail to articulate why the evidence is insufficient. Instead, they merely cite to evidence they believe shows the District's data is

inadequate, essentially asking us to reweigh the evidence. The Individuals apparently believe this approach is appropriate in light of *Silicon Valley*, *supra*, 44 Cal.4th 431. Citing to that case, the Individuals argue that it is appropriate for this court to engage in a detailed review "at a word and phrase level" of the Cost of Service Study. (See *id*. at p. 453.) However, the Individuals misread *Silicon Valley* in this regard.

In *Silicon Valley*, *supra*, 44 Cal.4th 431, the Supreme Court reversed the Court of Appeal, concluding that the county open space authority did not comply with the special benefit and proportionality requirements of section 4. (*Silicon Valley*, *supra*, at pp. 456-458.) In applying its independent judgment to the record, the Supreme Court did quote extensively from an engineer's report relied on by the county open space authority. (*Id*. at pp. 453-458.) In doing so, however, the Supreme Court was not resolving any disputed issue of fact. Indeed, the court noted the facts were undisputed as set forth in the engineer's report. (*Id*. at p. 455.) It quoted the report copiously to show that the report never properly differentiated between a general benefit and a special benefit as required under section 4. (*Id*. at pp. 454-455.) The Supreme Court was able to engage in this analysis without resolving any disputed fact. Thus, the challenge to the report there was not that its data was flawed or otherwise unreliable, but that it did not show the special benefits that were tethered to the proposed assessment.

Here, the Individuals do not make a similar argument. In fact, they challenge the data on which the Cost of Service Study is based. The Individuals point to evidence showing the data is unreliable. The District focuses on evidence proving the data is reliable. The trial court found the District's evidence more persuasive. To resolve the

33

Individuals' challenge as the Individuals insist is appropriate, we would have to reweigh the evidence. This we cannot do. (See *Reichardt v. Hoffman*, *supra*, 52 Cal.App.4th at p. 766.) *Silicon Valley*, *supra,* 44 Cal.4th 431 does not change the substantial evidence standard of review and does not allow us to independently resolve issues of disputed fact already decided by the trial court. If an appellant challenges a finding of fact, we must employ the substantial evidence standard of review. As such, we are not concerned about a conflict in the evidence. "We emphasize that the test is not the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631; italics omitted.)

Based on the record before us, we are satisfied that substantial evidence supports the court's factual determination that the District complied with section 6's substantive requirements through its reliance on the Cost of Service Study. The Individuals and the District argued their respective interpretations and explanations of the Hanemann Observations. The trial court believed the District's explanation was more credible and supported the data's reliability. In addition, the system improvement study, among other things, evaluated the District's water measurement accuracy between what was actually recorded in the field with what was recorded by the workers who operated the District's water delivery gates. It determined that the workers were reasonably accurate in their

34

water measurements. In the system improvement study, Natural Resources Consulting Engineers matched up flow data from the records of the workers with actual detailed field measurements from a test program and determined that it had "fairly good agreement between recorded measurements and the more accurate [test program] measurements."

While it is clear the District's water measurement system is not perfect, section 6 does not require perfection. Here, the Individuals have failed to show that substantial evidence does not support the conclusion that the data was reliable.[10] As such, their claims that the Cost of Service Study did not show proportionality because of a lack of sufficient data as well as the protest process was at a "fatal variance" with the cost of service because of differing and/or faulty data necessarily fail as well.

The Individuals also challenge the Cost of Service Study on the theory that it was not final and remained subject to change. The Individuals argue that the lack of finality rendered the written notice defective and the public hearing untimely because there was

---

[10] We are not persuaded by the Individuals' additional argument that the District's sending of "water cards" to its customers during the time in question somehow undermines the District's data or otherwise invalidated the protest process. A "water card" is shorthand for a form called a "Certificate of Ownership and Authorization of Agent or Tenant." The District uses these forms to keep information regarding agricultural acreage, names and addresses of owners and lessees, APN, gate and canal used, person authorized to order water, and who is obligated to pay. In other words, the water cards are customer information sheets the District uses to keep its customer database accurate. The District attempted to verify that the owner, tenant, canal, gate, field, account number, customer class, and APN information was accurate for owners and tenants prior to mailing the written notice of the proposed rate change. Again, the Individuals' contention goes to the weight of the evidence and the trial court's finding of fact. Further, the District presented evidence detailing its efforts to ensure that it had an accurate list of customers to whom written notices should be sent. The Individuals do not explain why this evidence is insufficient. We remain satisfied that substantial evidence supports the court's conclusion that the data was reliable.

not a final report on which to analyze the proposed rate increases. Although the record shows that Entrix's scope of work with the District was amended at the February 17, 2009 District Board meeting to include two workshops and the preparation of a "final" Cost of Service Study, there is no indication in the record that the Cost of Service Study changed from what was posted on the District's website on February 13, 2009. That version of the study did not bear any mark indicating that it was a draft. Written notice of the rate change was mailed on February 19, 2009 and referenced the Cost of Service Study on the District's website. The public hearing occurred on April 7, 2009, 47 days after the mailing of the notices. The fact that Entrix could have modified the Cost of Service Study does not violate section 6 because there is no indication that the study was modified in any way that calls into question the District's compliance with section 6 or otherwise makes either the Cost of Service Study or the written notices of the proposed rate increases invalid.[11]

After determining that the court's finding of fact that the data Entrix used in preparing the Cost of Service Study is reliable is supported by substantial evidence, we independently conclude (based on this finding of fact) that the District complied with section 6's substantive requirements in increasing the water rates.

---

[11]    For the same reasons, the Individuals' contention that the timing of the hearing violated section 6 because "one document to which the public was referred to justify the basis upon which the fee was determined remained subject to modification for the entire 45 days" fails as well.

## 5. *Procedural Requirements*

The Individuals also claim that the District failed to comply with many of the procedural requirements of section 6. We disagree.

Section 6 requires an agency to identify the parcels on which a fee is proposed and provide written notice by mail of the proposed fee to the record owner of each identified parcel. (§ 6, subd. (a)(1).) The Individuals claim the District did not comply with this requirement because the written notice lacked all rate classes that were included in the protest count. Specifically, they assert the following customer classes were not included in the written notice: pipe/small parcel tier 3, geothermal, feed lot, water user association, small acreage 1, small acreage 2, small acreage 3, recreation, District fish ponds, excess drainage, and independent.

The Individuals' argument confuses account types with customer rate classes. The account types are internal records kept by the District. The Cost of Service Study includes a chart that shows where each account type is placed for purposes of the customer rate class. All of the "missing" customer classes were accounted for except District fish ponds and excess drainage. However, the Cost of Service Study makes clear that there would be no rate schedule for drainage water. The District also admits that the fish ponds should not have been counted in the protest procedures because this account type refers to the District's own three ponds. Nevertheless, this inadvertent error did not render the written notice unconstitutional. As the District notes, disregarding the three fish ponds would only increase the percentage of protests one hundredth of a percentage point from 40.47 percent to 40.48 percent.

37

In addition, we were unable to find the account type: "pipe/small parcel tier 3" anywhere in the record. Perhaps, the Individuals meant to refer to "service pipe 3" and/or "small acreage 3" account types. Both were accounted for in the customer rate class pipe and small parcel-tier 2 customer class.

The Individuals next contend the protest procedure used by the District did not comply with the procedural requirements of section 6 because the protest process was not fully public. Section 6, subdivision (a)(2) requires an agency to conduct a "public hearing" about the proposed fee, and consider all protests against the fee "[a]t the public hearing." The Individuals contend the hearing was not "truly public" because the District "at no time before, during, or after the protest process provided either (1) the protests lodged or (2) the list of protestors who could lodge protests."

The District counters, arguing that section 6 does not require the protests lodged be made public. The District further argues that Government Code section 6254.16[12]

_____

[12]    Government Code section 6254.16 provides: "Nothing in this chapter shall be construed to require the disclosure of the name, credit history, utility usage data, home address, or telephone number of utility customers of local agencies, except that disclosure of name, utility usage data, and the home address of utility customers of local agencies shall be made available upon request as follows:  [¶] (a) To an agent or authorized family member of the person to whom the information pertains.  [¶] (b) To an officer or employee of another governmental agency when necessary for the performance of its official duties.  [¶] (c) Upon court order or the request of a law enforcement agency relative to an ongoing investigation.  [¶] (d) Upon determination by the local agency that the utility customer who is the subject of the request has used utility services in a manner inconsistent with applicable local utility usage policies.  [¶] (e) Upon determination by the local agency that the utility customer who is the subject of the request is an elected or appointed official with authority to determine the utility usage policies of the local agency, provided that the home address of an appointed official shall not be disclosed without his or her consent.  [¶] (f) Upon determination by the local agency that the public

38

supports its position because that section provides that the "name, credit history, utility usage data, home address, or telephone number of utility customers of public agencies" need not be disclosed.

Ironically, the Individuals and the District cite *Greene v. Marin County Flood Control & Water Conservation District* (2010) 49 Cal.4th 277 (*Greene*) to support their respective positions. In *Greene*, a flood control district proposed a storm drainage fee to fund improvements intended to prevent flooding and flood damage. (*Id*. at p. 280.) Under section 6, subdivision (c),[13] a majority of the property owners in the district voted in favor of the fee. The plaintiff challenged the legality of the election because the ballots were not secret. They contained the name and address of the voter and required the voter to sign the ballot. The plaintiff argued that inspection of the ballot would reveal how the person voted. (*Greene, supra,* at p. 280.) Although the procedures enacted by the flood control district provided that the ballots remain secret and would only be revealed for inspection under a court order, the Court of Appeal held that the measures were insufficient to protect the secrecy of the votes. (*Id*. at pp. 280-281.)

_____

interest in disclosure of the information clearly outweighs the public interest in nondisclosure."

[13]   Section 6, subdivision (c) provides: "Voter Approval for New or Increased Fees and Charges. Except for fees or charges for sewer, water, and refuse collection services, no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area. The election shall be conducted not less than 45 days after the public hearing. An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision."

In reversing the Court of Appeal, the Supreme Court analyzed section 4 and the Government Code section enacted to address section 4 to conclude that section 4 authorizes a ballot on which a property owner indicates his or her vote, name, and parcel and allows public disclosure of the ballots, at least during and after tabulation. (*Greene*, *supra*, 49 Cal.4th at pp. 291-292.) The Supreme Court then acknowledged the difference between section 6 and section 4, noting that section 6 allowed " 'procedures similar to those for increases in assessments.' " (*Greene*, *supra*, at p. 292.) Comparing the procedures under section 4 with section 6's procedures, the court determined that section 6, subdivision (c) authorizes government agencies to require property owners to identify themselves and their parcels on the ballot. (*Greene*, *supra*, at p. 294.) The court stopped short of establishing the amount of secrecy required, if any, because the flood control district protected ballot secrecy by requiring a court order before the ballots could be inspected by the public. (*Ibid.*) The court clarified: "Section 6, subdivision (c) by its plain terms was intended to provide a safe harbor for localities that conduct fee elections using procedures similar to the procedures prescribed for assessment balloting. We conclude that because the [flood control district] adopted such procedures, the election was therefore lawful. (*Greene*, *supra*, at p. 295, fn. omitted.)

The District contends *Greene*, *supra*, 49 Cal.4th 277 stands for the proposition that secrecy is not mandated by section 6. However, the court in *Greene* was concerned with an election under section 6, subdivision (c). As the Individuals point out, there was no such election here. We view the court's discussion of secrecy limited to voting under

40

subdivision (c). Therefore, *Greene* does not directly resolve the issue presented here: whether the protests lodged or the list of eligible protestors must be made public.

Despite the court's focus on section 6, subdivision (c) in *Greene*, *supra*, 49 Cal.4th 277, the Individuals maintain *Greene* "is helpful in understanding the rationale and standards to be applied in determining whether [the District] complied with the 'public hearing' component of Section 6." The Individuals note the Supreme Court's discussion that the secrecy provision for ballots was written some years after the approval of Proposition 218 and in response to agency practices that were contrary to enhancing the public's ability to control levies on it. (*Greene*, *supra*, at pp. 286-287.) The Individuals conclude that absent a specific statute, the lodged protests were public. We do not share the Individuals' conclusion.

We see no requirement in section 6 mandating an agency make public all protests votes or provide a list of eligible protest voters. Because the eligible protest voters consist predominately of record owners of the identified parcels, the identity of those owners is public. Perhaps, this fact militates to making the protest votes publically available, or at the very least, providing the list of eligible protestors. However, even if we determine these steps to be good policy, we remain mindful of the issues before us. The Individuals are challenging the constitutionality of the District's rate increase. As such, we need to analyze the District's compliance with the requirements of Section 6. We do not find any language in section 6, subdivision (a)(2) requiring the protest votes be made public. That subdivision's reference to a public hearing does not cause us to reach

41

this conclusion. Government Code section 53755 is silent as to making the protest votes or list of eligible protestors public.

In summary, we find nothing that requires the District to make the protest votes or list of eligible protesters public. In the absence of this requirement, we do not conclude that the District violated section 6 by maintaining the secrecy of the protest votes. This is especially true when the District took this action because it believed such information is protected from disclosure by Government Code section 6254.16.

### 6. *The Actual Rates the District Implemented*

Finally, the Individuals contend that because the final rates approved by the District varied from the rates supported by the Cost of Service Study or contained in the written notice of the rate change to the customers, the new rates are unconstitutional. We disagree.

Here, every rate actually imposed by the District is less than what the Cost of Service Study determined to be a single uniform rate that would meet all costs for the services provided. Put differently, the approved rates are less than the actual cost of service in every circumstance. The District claims to have adopted these lesser rates so that rates were not raised too quickly, which could adversely affect the customers. Thus, the District decided to gradually increase the rates over a period of years before the noticed rates are reached for many of its customers. This does not call into question the constitutionality of the rate increase.

We find nothing in section 6 that prohibits an agency from charging less than the proportional cost of service. The fees simply cannot exceed the proportional cost. "The

42

amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel." (§ 6, subd. (b)(3).)

Similar to the instant matter, in *Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708, the public agency chose to charge a lesser assessment than the actual proportional benefit to some landowners. (*Id*. at pp. 716-717.) The plaintiff argued the agency could not do so under section 4. The Court of Appeal disagreed, concluding "nothing in article XIII D prohibits discounted assessments, and nothing in article XIII D requires that any discounts be uniformly granted across all parcels in an assessment district." (*Id*. at p. 716.) Although the court in *Dahms* interpreted section 4, the language the court relied on is substantially similar to the language here. Under section 4, the assessment imposed on a parcel shall not exceed the reasonable cost of the proportional special benefit conferred on the parcel. (§ 4, subd. (a).) Section 6, subdivision (b)(3) contains a similar limitation not permitting the fee to exceed the proportional cost of the service. Thus, we determine the District adopting rates that were less than the rates contained in the written notice did not violate section 6. (Cf. *Dahms*, *supra*, at p. 716.)

III

*ATTORNEY FEES*

We next evaluate the District's appeal. The District challenges the court's postjudgment order awarding the Individuals their attorney fees.

43

Some three months after the trial court issued the statement of decision in favor of the District, the trial court awarded attorney fees to the Individuals as prevailing party under Code of Civil Procedure section 1021.5. The court awarded these fees based on the Individuals' constitutional challenge to the EDP. The District argues the court erred in awarding attorney fees because the Individuals were not prevailing parties. The District states it amended the EDP plan to get rid of the $20 and $1 fees far before trial. The Individuals contend there was no error because they prevailed on their claims challenging the EDP. Specifically, the Individuals claim the stipulation and statement of decision preclude the District from imposing EDP related fees at any time in the future.

A. The EDP

An irrigation district can establish rules for the equitable distribution of water. (See Wat. Code, §§ 22252, 22257.) In 2007, the District prepared the EDP to be implemented in times of a water shortage. Under the EDP, if the District declared a supply/demand imbalance, the District would apportion available water to agricultural users on a straight-line basis such that each qualifying acre would receive the same amount. Under the plan, nonagricultural users would receive water based on, among other things, past use. Although the EDP might affect the amount of water a customer would receive, the plan did not set a charge for water service. Instead, customers would be charged the District's standard water rate.

The EDP also created a district-wide, voluntary water exchange program where agricultural customers who did not want to keep their full allotment of water could sell all or a portion to other agricultural users. The exchange program included two potential

44

charges: a processing fee to cover the District's cost to administer the program and a $20 per acre-foot unused water penalty if a buyer ordered water from the exchange and did not use or offer to resell it.

In 2008, the District revised the EDP to, among other things, set the administrative charge at $1 per acre foot. On April 7, 2009, the District further revised the EDP to delete the $20 per acre-foot penalty. In addition, the District replaced the $1 administrative fee with a "qualitative description of a fee which will be determined by [District] staff, . . . such fee to be derived from the estimated cost of administration of the [exchange plan]." This administrative fee was never established for the 2009 supply/demand imbalance year, and no fees or charges from the exchange program were charged or collected.

### B. The Litigation

The operative complaint in the underlying consolidated action included seven causes of action aimed at the EDP. Although the matter proceeded to a bench trial, neither the District nor the Individuals point to any evidence presented at trial regarding the EDP. Instead, the parties cite to discussions between the court and counsel for the parties regarding the EDP:

> "The COURT: They never, never, never used it or imposed it, which I think is rendered moot. So I don't want to waste our valuable time on that if it's moot, if it's moot.
>
> "[The Individuals' Attorney]: The actual fees, the $20 fee and $1 fee, are moot because they are not proceeding; . . . and that's what our trial brief briefed, and that right--I don't want to make the entire argument here because we're not doing that part at the moment. [¶] But if you have, say, a $10 water rate subject to an escalator from

45

another program, that does not comply with Prop 218 when you don't know what the escalator is.

"THE COURT:  So the equitable distribution could affect the water rate paid?

"[The Individuals' Attorney]:  Absolutely.

"THE COURT: Okay, then, we'll hear about it.

"[The Individuals' Attorney]:  Okay."

This exchange suggests that the validity of the EDP would be litigated at trial.

However, the Individuals do not cite to the record where it was actually argued at trial.

During trial, the parties appeared to agree the EDP would not be an issue:

"THE COURT:  Do we need to go through the EDP today?

"[The District's Attorney]:  Given the discussion yesterday, I do not believe so.

"THE COURT:  No, I believe what the statement was – apparently there's no rate increase as a result of the EDP.  There's no concern; is that a fair statement?  If that's a fair statement, then I don't want to hear any discussion about it.

"[The Individuals' Attorney]:  I don't mean to interrupt . . . . [¶]  I think Your Honor is correct, as long as the EDP cannot create or raise rates, then in this litigation it has no other role, therefore, the first five [sic][14] causes of action are moot.

"THE COURT:  So the first five [sic] causes of action are not a concern?

"[The District's Attorney]:  Well, I think what we discussed yesterday is that the revisions to the EDP render this whole issue moot.  I think [that] was the discussion we had yesterday.

14    Claims challenging the EDP were actually made in the first six causes of action as well as cause of action number 10.

46

"[The Individuals' Attorney]: . . . [¶] So long as we can rely on what [the District's Attorney] stated yesterday, that those regulations cannot impose charges, then we're fine. We don't need our first five [sic] causes of action.

"THE COURT: In other words, the equitable distribution plan does not increase the rates?

"[The District's Attorney]: It does not.

"THE COURT: The increases in the water rates, that's a separate issue, but the EDP itself doesn't raise anything.

"[The Individuals' Attorney]: So long as it doesn't do that – it has the text at the bottom of the schedule, but so long as [the District] cannot by its board take the EDP and create a new charge - -

"THE COURT: Well, we agreed yesterday that the text at the bottom simply means there may be a limited supply delivered, but that's not going to increase the rates.

"[The Individuals' Attorney]: So long as that is exactly what the text means, we are fine. I just want to make sure that that's what the text means and whatever decision comes out of it will tell the world that that's what the text means, that it's only about the quantity and will not involve charges, then we are absolutely great with the first five [sic] causes of action.

"THE COURT: Do you agree with that Counsel?

"[The District's Attorney]: Well, the language of the equitable distribution plan makes no reference whatsoever to raising the rates for delivery of water.

"THE COURT: Can it [the EDP] raise the rates?

"[The District's Attorney]: No.

"[The Individual's Attorney]: Then we're good."

47

This exchange indicates the parties agreed the validity of the EDP was not going

to be an issue at trial. The Individuals do not provide any other citation to the record

showing where they argued, at trial, the EDP was invalid or offered any evidence proving

such.

As discussed above, the trial court found in favor of the District on all causes of

action, except for those involving the EDP, which it dismissed as moot. The statement of

decision contained the following discussion of the EDP:

> "With regard to the validity of the [District's] enactment of
> Resolution 22-2008, adopting revised regulations for the equitable
> distribution of water (the Equitable Distribution Plan, or 'EDP'), the
> court find that the [District's] actions were valid. The court based its
> decision on the following:
>
> "On November 18, 2008 the [District] Board amended existing EDP
> Regulations to improve the EDP implementation process. [Record
> Citations.] The amended EDP Regulations included a straight-line
> method of apportioning water for agricultural purposes [record
> citations], contained a $20 per acre-foot 'unused water charge'
> [record citations] and a $1 per acre-foot processing fee for water
> transacted through the water exchange [record citation].
>
> "On April 7, 2009 the [District] amended the EDP regulations to
> remove the unused water charge and the processing fee. [Record
> Citations.] Because the unused water charge and the processing fee
> were deleted from the EDP Regulations before the operative
> complaint was filed and were never charged or collected, the
> PARTIES stipulated and the court finds that the EDP does not
> impose a property-related fee or charge. Plaintiff's EDP claims
> (First, Second, Third, Fourth, Fifth, Sixth and Tenth causes of
> action) therefore, are dismissed as moot by stipulation.
>
> "The [District] is a California Irrigation District operating under the
> Irrigation District Law. (Wat. Code, § 20500 et seq.) Irrigation
> Districts are required to establish equitable rules for the distribution
> and use of water. (Wat. Code, §§ 22257, 22252.) The court finds
> that in adopting an EDP, the [District] was discharging its obligation

48

to establish equitable rules for the distribution of water, and since the amended EDP did not impose property-related fees or charges, did not violate Prop. 218."

## C.  The Motion for Attorney Fees

A month after the court issued the statement of decision and over three months after trial, the Individuals moved for attorney fees and costs under Code of Civil Procedure section 1021.5.  In their motion, the Individuals argued they were the prevailing party on the EDP issue and they enforced an important right affecting the public interest.  The District opposed the motion, asserting, among other things, that the Individuals could not be the prevailing party because the EDP issue was not litigated and the Individuals did not obtain any judicial resolution of the issue.

The court heard the motion for attorney fees on October 5, 2011, nearly six months after trial concluded.  Before hearing oral argument, the court stated its tentative ruling to award attorney fees to the Individuals because the Individuals "did enforce an important right affecting public interest" in relation to the EDP.  As part of its tentative ruling, the court explained:  "The $20 fee and the $1 fee violated Proposition 218.  Plaintiff filed a validation action under C.C.P. 860 seeking a declaration that these fees were imposed in violation of Prop 218.  Defendant [District's] deletion of these charges in April of 2009 was a positive step, but didn't provide a validation judgment.  The stipulation that lead to this judgment on June 16, 2011, occurred in the middle of trial in April 2011."

In response to the court's tentative ruling, the District's counsel asked the court to explain the link between the Individuals' action and the change in the EDP. The court responded:

> "The deletion of the $20 fee and the $1 fee by [the District] in April was a good thing, a positive thing, but that wasn't enough. That was not enough because, number one, there was no stipulation that these fees were in violation of Prop 218. There was nothing creating an interim validation-type judgment that they sought by their merely deleting the fees.

> "Now – and what really – frankly, the problem is, is the answer filed by [the District] of – a few months later from July where they denied all of the allegations of causes of action one through six, and ten. They said none of these allegations have any truth, so they could take the position, 'Well, Okay. We'll please the public.' Assume there was public pressure from the Farm Bureau and other agencies, and they said, 'Okay. Let's make them happy. Let's delete these fees.' That doesn't resolve the legal issue were they unlawful or not, and it doesn't protect the public in the future should they put these back. That's the difference. It wasn't enough in April, what they did. It was good, but it wasn't enough. And so it took this lawsuit to bring it to the point where finally a judgment is entered and saying, 'They're deleted, they were unlawful, and the future parties can rely on this judgment if [the District] tries to put these fees back.' That's the difference.

> [¶] . . . [¶]

> "What really hurts [the District] is their answer in July. I had the clerk send that to me yesterday because I said, 'What was the answer? What was their position.' I had them send me your trial brief because I said, 'Well, what was their position at trial? I wanted to be clear about this.'

> "So your position at trial was correct, and it shows you're willingness, hopefully, to settle it appropriately. But when you filed your answer in July 2009, it wasn't the right answer. It was – you're still at issue. That's the basis of the ruling."

50

The court subsequently entered an order awarding the Individuals $77,375 in attorney fees.  The District timely appealed.

### D.  Standard of Review and Analysis

"On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion.  However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142.)  Although "the decision whether to award attorney fees under section 1021.5 rests initially with the trial court" (*RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 775 (*RiverWatch*)), the court does not have the discretion to award such fees unless the statutory criteria have been met as a matter of law.  Where the material facts are undisputed, and the question is how to apply statutory language to a given factual and procedural context, the reviewing court applies a de novo standard of review to the legal determinations made by the trial court.  (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

"To obtain attorney fees under section 1021.5, the party seeking fees must show that the litigation:  ' " ' " '(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) [was necessary and] imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter.' "  [Citation.]'  [Citation.]" '  [Citations.]  Because the

51

statute states the criteria in the conjunctive, each must be satisfied to justify a fee award." (*RiverWatch*, *supra*, 175 Cal.App.4th at p. 775.)

Here, regardless if we apply an abuse of discretion standard of review or the less deferential de novo standard of review, the trial court's order awarding attorney fees to the Individuals cannot stand. The court based the award on a faulty assumption, namely the EDP's $20 fee and $1 fee violated Proposition 218. Almost two years before trial and prior to the filing of the operative complaint, the District deleted the $20 fee and the $1 fee from the EDP. As such, it is not surprising that the parties did not litigate this issue at trial. And the court did not make any finding regarding the constitutionality of the two fees.

In addition, the stipulation as set forth in the statement of decision does not support the award of attorney fees. That stipulation reads in its entirety: "Because the unused water charge and the processing fee were deleted from the EDP Regulations before the operative complaint was filed and were never charged or collected, the PARTIES stipulated and the court finds that the EDP does not impose a property-related fee or charge." The Individuals insist that the "logical companion" to the stipulation is: "Had the new charges in the EDP not been deleted, the EDP would have violated Prop 218 and with it all of the rates that relied on the EDP." The Individuals' argument, however, falls prey to that most fundamental of logical errors, affirming the consequent. It does appear the court found the EDP does not impose a property-related fee or charge because the District deleted the unused water charge and processing fee from the EDP. Nevertheless, it does not necessarily follow that the court would have found that charge

52

and fee violated Proposition 218 if they remained. Indeed, on the record before us, there is very little on which the court could have based such a conclusion.

We see nothing in the stipulation indicating that the District agreed that the $20 and $1 fees associated with the EDP violated Proposition 218. Nor is there any support in the remainder of the statement of decision showing the court determined these fees were unconstitutional. This issue was not presented to the court during trial because the District had deleted the fees prior to the filing of the operative complaint and the District's trial counsel explained to the court that the EDP does not raise water rates. The Individuals do not point to anything presented at trial on which the court could have based a finding that the fees violated Proposition 218.

Ignoring this omission, the Individuals argue that the District waived its right to try the constitutionality of the EDP fees by entering into the stipulation. We disagree. Again, simply reading the plain language of the stipulation, there is no indication that the District was agreeing that but for the deletion of the fees, the EDP would have been unconstitutional. Further, we see nothing else in the record even hinting that the District conceded the EDP was unconstitutional.

In addition, unlike the trial court, we do not see the significance of the District's denial of the allegations contained in the operative complaint's causes of action aimed at the EDP. Causes of action numbers one, two, and four specifically challenge the $20 fee. Cause of action number three attacks the $1 fee. Causes of action five, six, and 10 dispute the validity of EDP in general based on the fees charged under the EDP. In regard to these claims, the Individuals asked the court to find: (1) the $20 fee invalid

53

under section 4; (2) the $1 fee invalid under section 6; and (3) "all property related levies" invalid under section 4. The District consistently maintained the EDP, with or without its fees, did not violate sections 4 and 6. The District's answer reflected this position, and we determine there is nothing specious about the District's denial of the EDP allegations. It certainly does not cause us to interpret the stipulation as an admission that the EDP was unconstitutional absent the deletion of the fees.

Finally, there is no language in the statement of decision that a District customer could invoke to prevent the District from charging a fee in relation to the EDP in the future. We do not read the stipulation or the court's explanation of the stipulation and the EDP in the statement of decision as indicating that the District could never charge any fee associated with the EDP. Of course, customers could challenge such a fee, but there is nothing in the statement of decision that prohibits the District from instituting a fee, in relation to a voluntary water exchange program, in the future.[15]

In short, we determine the trial court erred in awarding the Individuals their attorney fees. The court based its decision on a "finding" that the $20 and $1 fees violated Proposition 218. There was no finding by the trial court or stipulation by the parties to support that conclusion. We thus conclude the trial court's decision exceeded

---

[15]    We draw a distinction between a fee associated with a voluntary water exchange program under the EDP in times of supply/demand imbalance with an increase of water rates. The District explicitly represented to the trial court that the EDP does not increase water rates. If the District tried to increase water rates through the EDP contrary to its representation to the trial court, its customers would have a strong challenge to the imposition of those fees, including referring to the statement of decision and trial transcript as a bar to those water rate increases.

the bounds of reason and constituted an abuse of discretion. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 698.)  In addition, we determine, as a matter of law, in regard to the EDP, the Individuals did not confer a significant benefit on the general public or a large class of persons as required by Code of Civil Procedure section 1021.5.  (See *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 637.)

DISPOSITION

The judgment is affirmed.  The order awarding attorney fees is reversed.  The District is awarded its costs for this consolidated appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

McDONALD, J.

McINTYRE, J.

55

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MICHAEL W. MORGAN et al., | D060146, D061087 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. ECU04936 ) |
| IMPERIAL IRRIGATION DISTRICT, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent; | |
| IMPERIAL COUNTY FARM BUREAU, | |
| Real Party in Interest and Appellant. | |

THE COURT:

The opinion filed January 17, 2014, is ordered certified for publication.


<u>/s/ Huffman</u>
HUFFMAN, Acting P. J.