Filed 12/5/22 Walter v. Estate Strategies CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| SALLY PATTON WALTER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ESTATE STRATEGIES, INC., et al., <br><br> Defendants and Appellants. <br><br><br> VENTURA COUNTY COUNCIL OF BOY SCOUTS OF AMERICA et al., <br><br> Defendants and Respondents. | 2d Civil No. B280172 <br> (Super. Ct. No. P079997) <br> (Ventura County) |

Sally Patton Walter, as an individual, as trustee of the Patton Family Lead Trust and as executor of the estate of Lowell Patton, and Jodi Patton Ream (plaintiffs) appeal from the judgment entered after a court trial in favor of defendants Estate

Strategies, Inc. (ESI), Richard Sorensen[1], Matthew Mack, Mark Sherwood, Jack Patton and the Ventura County Council of the Boy Scouts of America (VCC) (collectively, defendants).

Plaintiffs contend defendants defrauded, breached fiduciary duties toward, were professionally negligent and engaged in elder financial abuse when they drafted and administered an estate plan for their parents, Lowell and Mary Lou Patton (the Pattons). The estate plan included three charitable remainder unitrusts (the CRUTs) and a charitable lead annuity trust (CLAT or lead trust) through which the Pattons made substantial, irrevocable gifts to various charities. They contend the trusts did not significantly benefit their parents or satisfy their desire to leave the maximum amount possible to their children. Although ESI, Sorensen and Mack disclosed that their fees for creating the estate plan would be paid by the charities, they did not disclose the estimated amount of their compensation or that it would be based on the size of the Pattons' gifts.

Sitting as trier-of-fact, the trial court found in favor of defendants, concluding the estate plan was competently designed to achieve the Pattons' goals and that defendants had no duty to disclose how the charities would calculate respondents' compensation because the Pattons' money was not used to pay it. In addition to awarding costs, the trial court awarded defendants their expert witness fees under Code of Civil Procedure section

---

[1] Counsel has informed the Court that Richard Sorensen died in March 2021.

998.[2]  Although the trial court denied defendants ESI and Sorensen's motion for contractual attorney fees, it awarded them cost of proof sanctions of $1,000,981.50 based on plaintiffs' denial of 32 requests for admission.  (§ 2033.420.)  Plaintiffs contend the trial court erred because the section 998 offers to compromise were not made in good faith and because they had a reasonable basis for denying the requests for admission.  We agree.  In a cross-appeal, ESI and Sorensen contend the trial court erred when it denied their motion for contract-based attorney fees.

We reverse the order awarding costs of proof sanctions and in all other respects affirm.

*Facts*

Lowell and Mary Lou Patton, both of whom were born in 1928, had been married for more than 40 years when Mary Lou became seriously ill with leukemia in early 2002.[3]  She died of the disease on April 8, 2002.  Before January 2002, the couple did not have an estate plan.  They had three adult children, Sally Patton Walter, Jodi Patton Ream and Jack Patton, and several grandchildren.  In addition to Lowell's pharmacy business, the Pattons owned commercial and residential real estate and other assets.  As relevant here, these assets included a commercial building on 16th Street in Santa

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

[3] Like the trial court and the parties, we occasionally use the first names of the parties for clarity, intending no disrespect.

Monica, and a minor league baseball team known as the Bakersfield Blaze.[4]

*The Pattons' 2002 Estate Plan*

Lowell's long-time accountant, Don Hedrick, urged him to create an estate plan. Hedrick introduced the Pattons to Mark Sherwood, a lawyer Hedrick knew from church.[5] Hedrick gave Sherwood some background information about the Pattons and their assets before Sherwood met with the Pattons at Hedrick's office for the first time. That information indicated the Pattons' assets were worth about $15,000,000. It assigned a value of $3,800,000 to the Bakersfield Blaze and $3,000,000 to the 16th Street property.

At his first meeting with the Pattons and Hedrick on February 5, 2002, Sherwood talked with the Pattons in general terms about creating an estate plan. Based on his conversation with the Pattons, Sherwood understood that Mary Lou was concerned Lowell would treat their daughters unfairly in the estate planning. She did not want their daughters to receive a large, lump sum of money because she was concerned about their ability to manage it. Mary Lou was also concerned that the sons-

---

[4] In addition to these assets, the Pattons also owned their home on Berkeley St. in Santa Monica, another commercial building on Montana Ave. in Santa Monica, a single family house in Bakersfield, an interest in a Kingman, Arizona radio station and a retirement account. These assets were not transferred to the trusts at issue here.

[5] The Pattons and most of the other individuals involved in this case, including Hedrick, Sherwood, Richard Sorensen and Matthew Mack were or are members of the Church of Jesus Christ of Latter Day Saints (LDS).

4

in-law would exert too much influence over the surviving spouse, Lowell or Mary Lou, after the first spouse died.  Although she wanted as much money as possible to go to her daughters, she also wanted the distributions to be managed over time.  During the meeting, the Pattons retained Sherwood to prepare several documents for them including pour-over wills, living trusts, advanced health care directives, a community property agreement, durable powers of attorney and a family revocable trust.

Sherwood understood from this and other meetings that the Pattons were also interested in giving money to charity.  They were life-long members of the LDS Church and had given generously to it by tithing and making other donations.  He recommended that the Pattons engage an estate planner to design the remainder of their estate plan, including any charitable trusts they decided to establish, and to draft the necessary documents.  Although he gave them several names, the Pattons wanted to work with Richard Sorensen and his firm, Estate Strategies, Inc. (ESI) because they knew him from church.

After the meeting, Sherwood spoke with Sorensen about creating charitable remainder unitrusts (CRUTs) for the Pattons.  Sorensen provided Sherwood with illustrations of how a CRUT would impact future tax liability and generate income.  All of the written illustrations that were shown to the Pattons included the purchase of life insurance by the trust.  The Pattons were not shown a written illustration of a CRUT that did not involve the purchase of life insurance.

On February 7, 2002, Sherwood met with the Pattons again.  They reviewed and signed the documents Sherwood had drafted, including their wills and the revocable trust.  These

documents do not reflect that the Pattons had decided to make any charitable donations or to transfer assets to a charitable trust.

Sorensen joined the meeting later that afternoon; it was the first time he met with the Pattons in person. Sorensen understood that Mary Lou was very ill. At the meeting, however, she was alert, interested and engaged. The estate plan was very important to her. She wanted an irrevocable estate plan that would provide a controlled income stream to her children. She also wanted to reduce their tax liability. Minimizing taxes and avoiding attorney and estate planning fees were more important to Lowell but were also of interest to Mary Lou. Sorensen believed the CRUT was the best way to accomplish all of these goals simultaneously.

At the February 7 meeting, Sorensen and Sherwood reviewed the ESI engagement letter with the Pattons and they signed it. The engagement letter explained that ESI would prepare the Pattons' charitable trust documents for them, at no cost to the Pattons, if they chose to make gifts to participating charities. Alternatively, the Pattons could pay an hourly rate for ESI's services, and for the services of its attorney, Matthew Mack. The Pattons did not ask Sorensen to explain how ESI's compensation agreements with the charities worked or how much his compensation would be.

Sorensen explained to the Pattons that a charitable remainder unitrust (CRUT) would require them to irrevocably transfer an asset to the trust. Income generated by the trust could be distributed either to the Pattons or to their designated income beneficiaries. After 20 years, the trust would terminate and the charities would receive the remainder. Sorensen,

6

Hedrick and Sherwood advised that the Blaze should be incorporated and sold to fund a CRUT because the asset had appreciated in value and its sale would otherwise generate significant tax liability.[6] Transferring the asset to a CRUT would remove the asset from the estate and generate tax deductions. Sorensen prepared illustrations to show the Pattons how a CRUT would impact their tax liability. These illustrations compared a taxable sale of the Blaze to a sale that occurred after ownership of the team was transferred to a tax-exempt trust. Sorensen did not prepare an illustration comparing the CRUT to a taxable sale that occurred after the death of one spouse caused a step-up in the basis of that asset.

By the end of the meeting, the Pattons had agreed that they would incorporate the Blaze baseball team, establish a CRUT, and fund it with the Blaze stock. They engaged Sherwood to be the management trustee of the CRUT. The Pattons had also agreed to form an LLC or LLP to hold ownership of the 16th Street property. Sherwood and Sorensen discussed with them the possibility of placing the 16 Street property into a CLAT.

The Pattons eventually designated four charities as charitable remaindermen for the CRUTs: the LDS Church, the Ventura County Council of the Boy Scouts of America (VCC), the YMCA of Metropolitan Los Angeles, and the Casa Colina Centers for Rehabilitation Foundation.[7] The LDS Church was not one of

---

[6] Lowell Patton purchased the team for $200,000 in the mid 1980s and held it as a sole proprietorship. In 2002, Hedrick estimated it was worth about $4,000,000. Others, including Sherwood, believed its value was closer to $2,000,000.

[7] The Patton Family Lead Trust, established in February 2003, designated five charities as income beneficiaries: the LDS

ESI's participating charities and did not pay any fees, costs or commissions to ESI. Sorensen described the other charities to the Pattons; they did not have prior relationships with any of these charities. Sorensen chose them because he understood Lowell Patton had been involved with the Santa Monica YMCA and that they both had an interest in helping special needs children. They decided to distribute income from the CRUT to their children, rather than themselves, and to establish three separate trusts so that each child could manage their own trust.

On February 27, 2002, Sherwood, Sorensen and their notary, Jessica Horgan, met the Pattons in Mary Lou's room at UCLA hospital to sign the CRUT documents which had been drafted by Matthew Mack. The Pattons signed Mack's engagement letter. Each CRUT appoints Sherwood as the management trustee and Mack as the administrative trustee.

Lowell was not at the hospital when Sorensen and Sherwood arrived, so they first met with Mary Lou alone. They went through the trust documents, reviewed the charitable beneficiaries and talked about how the income distribution to the children would work. Mary Lou understood the children would not receive income distributions from the CRUTs until the Blaze was sold. When Lowell arrived, they again went through the documents with him and Mary Lou. Both Pattons signed the CRUTs.

*The Bakersfield Blaze*

The Bakersfield Blaze Baseball Club Inc. was incorporated on March 19, 2002. Lowell was named the president of the corporation and Jack Patton was named its vice-

---

Church, VCC, Casa Colina Foundation and Vista Del Mar Child and Family Services.

president.  On April 1, 2002, Mary Lou signed certificates issuing 1,000 shares of stock in the corporation.  Lowell signed the certificates on April 4 or 5, 2002.  Six hundred shares were transferred to Jack's CRUT, while the CRUTs for Sally and Jodi received 200 shares each.  Because Sherwood was the management trustee of each CRUT, he controlled the corporation after the shares of stock were distributed to each CRUT.

Lowell Patton had acquired the Bakersfield Blaze baseball team in late 1984 or 1985 for $200,000.  The team was a member of the California League of Professional Baseball (the "League").  In 1996, Jack Patton became its vice president of baseball operations and general manager.  The Blaze appears to have been plagued by poor attendance and an aging ballpark where home plate faces into the setting sun.  Its financial records were described by some witnesses as having been in disarray.  By 2002, the team did not have sufficient revenue to pay all of its operating expenses.  Jack had to periodically ask Lowell for cash to make payroll, pay other expenses and pay dues owed to the League.  The team was being sued by vendors of uniforms, caps, equipment, buses and hotel rooms and owed back taxes to both the state and federal governments.  In addition, the League routinely threatened to foreclose on the franchise itself because the team failed to pay its league dues.

Sherwood testified that, after Mary Lou's death, Lowell contacted him and wanted to resign as President of the Blaze.  He wanted Jack to handle the decision making for the team. Sherwood drafted a document entitled "Unanimous Written Consent of President and Shareholder of Bakersfield Blaze Baseball Club, Inc." in which Lowell stated that he wished to resign as president of the corporation and to have Jack

9

appointed president. Sherwood, the sole shareholder, noted his agreement with both actions.

Sherwood testified that he either mailed the document to Lowell or gave it to one of Lowell's daughters, Sally or Jodi, to have it signed. He did not recall how or when he got the signed document back, but at some point Sherwood placed it in the corporate book for the Blaze. Sherwood also testified that, on one occasion, Lowell told Sherwood he did not care about the team anymore, did not want to invest more money into it and wanted to just return the team's franchise to the League. Sherwood refused. Jack testified that, by the summer of 2003, Lowell was tired of dealing with the Blaze and wanted to return the franchise to the League instead of paying the outstanding League dues.

In October 2003, the California Restaurant Association (CRA) offered to purchase the Blaze for $3.5 million. The offer was withdrawn in December 2003, after the CRA reviewed the team's finances and did other due diligence. The team had received other offers as well, but those failed because they relied on tax incentives that were not available, the construction of a new stadium or financing terms the CRUTs could not meet.

On November 30, 2003, while the offer from the CRA was still pending, Lowell and Sally sent notice to Sherwood and Mack that they "formally seek to remove" the men as management and administrative trustees. Both men remained in their positions and continued their efforts to sell the team. Sherwood believed the notice of removal was ineffective because, among other things, it did not identify the specific trusts to which it pertained, did not identify successor trustees or indicate

10

whether the successors had agreed to serve, and did not provide notice to the other beneficiaries of the trusts, as required by the trust documents. Mack was willing to resign, but agreed with Sherwood that they had a fiduciary duty to the CRUTs to finalize the sale of the team, if possible, before leaving. Neither Sherwood nor Mack advised the Pattons of the defects they saw in the notice of removal.

After the CRA declined to exercise its option, the League itself expressed an interest in buying the Blaze. Although Sherwood and Jack Patton initially demanded a purchase price between $3 million and $3.5 million, the parties agreed in May 2004 on a sales price of $2.2 million. While this offer was pending, the team transferred its franchise to the CRUTs and the CRUTs granted the team a license to continue operating under that franchise. Both of these documents were signed by Jack Patton as "President" of the Bakersfield Blaze Baseball Club, Inc. and by Mark Sherwood as the management trustee of the CRUTs.

The sale of the team to the League finally closed in November 2004. Sherwood did not notify Lowell, Sally or Jodi of the sale before it closed. Mark Sherwood and Matthew Mack signed the purchase agreement on behalf of the CRUTs. After the sale closed and expenses were deducted, $1.9 million was distributed to the CRUTs. Consistent with the terms of the CRUTs, Sherwood made early distributions to the designated charities. He also paid trustee fees to himself and to Mack, the administrative trustee.

*The Lead Trust*

In late 2002, while they were finalizing Mary Lou's estate, Sherwood and Hedrick contacted Sorensen for help

11

planning the Patton Family Lead Trust, an irrevocable CLAT, or lead trust, that would hold the 16th Street property and then the proceeds from its sale. Mack drafted the trust document. In general terms, the lead trust makes annual distributions equal to 7.5% of the fair market value of the trust estate to its income beneficiaries for a period of 15 years. The income beneficiaries are five charities: the LDS Church, the VCC, Casa Colina and Vista Del Mar Child & Family Services. After the trust terminates, the remainder is distributed in equal shares to Sally, Jodi and Jack. Distributions to the charities are payable annually in arrears. In other words, distributions are owed even before the trust property is sold and will be made from principle if the trust lacks sufficient income. Sally was named the management and administrative trustee of the lead trust.

Sorensen and Lowell met at Lowell's home on February 21, 2003. Sorensen explained the trust document to Lowell, who then signed the trust and a warranty deed transferring the 16th Street property to the trust. Jodi was present while Sorensen was explaining the trust to Lowell.

Sally signed the lead trust later that same day at Sorensen's office. She was also presented with a "negotiating agreement" that designated Sorensen the trust's exclusive "negotiating agent" for the sale of the 16th Street property. If Sorensen negotiated a sale, he would be paid the greater of 1.5% of the sale price or 15% of the difference between the gross sale price and $2,000,000.[8] Sally signed the agreement. Sorensen was not a licensed real estate broker or agent.

---

[8] A pervious version of the agreement, signed only by Lowell, would have paid Sorensen 50% of the difference between the sales price and $2,000,000.

12

On Father's Day 2003, members of the Patton family met with Sorensen, Mack and Hedrick regarding the negotiating agreement and other issues. The meeting was taped for Lowell's benefit and became hostile, as Steve Walter, Sally's husband, criticized Sorensen for unfairly trying to extract a huge commission on the sale of the 16th Street property. After the meeting, Lowell rescinded the negotiating agreement.

The 16th Street property was sold in June 2006. Net proceeds of about $2.9 million were deposited in the lead trust. ESI received no payment from any of the charities, or any other source, relating to the lead trust.

*Altered Documents*

Plaintiffs' expert forensic document examiner, Frank Hicks, concluded that signatures appearing on five documents are not authentic, original signatures but are instead cut-and-paste signatures, photocopied from other documents. Defendants do not dispute these conclusions. The documents involved are:

A. Exhibits 26, 43, 44 and 163: Exhibit 26 is an engagement letter dated February 7, 2002 in which Mary Lou and Lowell engage Sherwood to incorporate the Blaze, form an LLC to hold the Montana St. property and review a CLAT to be formed to own the 16th St. property. Exhibit 163 is also an engagement letter dated February 7, 2002. In it, the Pattons engage Sherwood to form an LLC to own the Blaze and an LLP to own both the Montana St. and 16th St. properties. Hicks testified that the entire signature block from one letter had been cut-and-pasted onto the other letter, although he could not determine which contained the original signatures. Exhibits 43 and 44 are also engagement letters in which Sherwood is hired by Lowell and Jack to represent the Blaze, and by Lowell to finalize

13

Mary Lou's estate.  Hicks testified Lowell's signatures on these documents were cut-and-pasted from either Exhibit 26 or 163.

B.  Exhibits 113 and 130: Exhibit 113 is the "Unanimous Written Consent" in which Lowell resigns as President of the Blaze and consents to the appointment of Jack to that position.  The document is dated May 1, 2002 and is also signed by Sherwood as the sole shareholder of the corporation.  Exhibit 130 is a "Uniform Statutory Form Power of Attorney," dated October 14, 2003, in which Lowell grants his power of attorney to Sally.  Lowell's signature on this document is notarized.  Hicks concluded that this is the original signature.  Lowell's signature on the Unanimous Written Consent was cut-and-pasted from the Power of Attorney.

C. Exhibits 23 and 114:  Exhibit 23 is a "Living Trust Fee Agreement" in which Mary Lou and Lowell retain Sherwood to complete the initial estate plan.  It is dated February 5, 2002.  Exhibit 114 is a letter dated December 12, 2003 in which Lowell acknowledges that Sherwood returned client files to him.  Hicks concluded that Lowell Patton's signature on Exhibit 23 is an original and that it was cut-and-pasted onto Exhibit 114.

*Procedural History*

Litigation relating to the trusts began almost immediately.  In February 2005, Lowell filed a proceeding in the probate court to remove Sherwood and Mack as trustees.  (*In the Matter of Lowell & Mary Lou Patton Trust,* No. P078851.)  They petitioned for approval of their accountings and for payment of trustee fees.  The probate court removed Sherwood and Mack, declined to authorize additional trustee fees and appointed an independent trustee for the CRUTs.

14

In February 2006, Lowell filed a complaint against ESI, Sorensen, Mack and Sherwood relating to the CRUTs. That complaint was later amended to name as defendants the charitable beneficiaries other than the LDS Church. (*Lowell T. Patton v. Estate Strategies, Inc., et al.,* No. CIV238964.) Casa Colina and the YMCA filed separate petitions in the probate court against Sally Patton Walter for breach of trust. (*In the Matter of the Patton Family Lead Trust Dated February 21, 2003*, No. P079997; *In the Matter of the Patton Family Lead Trust Dated February 21, 2003*, No. P080083.)

Lowell Patton died on April 2, 2007. In November 2007, his estate filed a complaint against the charitable beneficiaries of the lead trust. (*Estate of Patton v. YMCA of Metropolitan Los Angeles, et al.*, No. 56-2007-00307094-CU-FR-VTA.) All of these actions were consolidated in the present matter.

In late 2011, a settlement was reached with the charities, except the Ventura County Council of the Boy Scouts of America (VCC). They agreed to assign their interests in the CRUTs and the CLAT to the LDS Church.

This litigation continued against Sherwood, ESI, Sorensen, Mack and the VCC. In March 2013, Sally amended the complaint to add Jack as a Doe defendant on the theory that he conspired with and aided and abetted the remaining defendants' torts. In April 2014, the trial court denied defendants' motions for summary judgment. ESI made a section 998 statutory offer to compromise for $350,000. Mack made an offer to compromise for $50,000 and Sherwood offered $45,000. Plaintiffs rejected each offer.

15

After a 31-day non-jury trial, the trial court found in favor defendants. It later awarded expert witness costs to the defendants whose section 998 offers were rejected. The trial court denied ESI and Sorensen's motion for $1,988,383.50 in contract-based attorney's fees. However, it awarded them $1,000,981.50 based on plaintiffs' unreasonable denial of 32 requests for admission. (§ 2033.420.) In their cross-appeal, ESI and Sorensen contend the trial court erred in denying their motion for attorneys fees.

*Standard of Review*

Plaintiffs insist that, because the issues on appeal "require[] a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) But we are also required here to review the trial court's findings of fact. Those findings are reviewed for substantial evidence. "Under that standard, our review begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below." (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299 (*Williamson*).) "[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it." (*Morgan v. Imperial Irrigation District* (2014) 223 Cal.App.4th 892, 916.) This traditional rule on appeal is lost on plaintiffs and their counsel. The "facts" as alleged by them, were not credited by the trial court.

*Alleged Breach of Fiduciary Duty*

Plaintiffs contend defendants ESI, Sorensen, Mack and Sherwood breached their fiduciary duties to the Pattons because they did not disclose that the participating charities would calculate ESI, Sorensen and Mack's compensation based on the size of the Pattons' donations, the amount these defendants estimated they would be paid, or that their compensation would be more than they would earn if paid a reasonable hourly rate. Plaintiffs contend the decisions to create both the CRUTs and the lead trust were breaches of fiduciary duty because the trusts served no purpose other than to generate ongoing "kickbacks" or "commissions" for defendants. They contend the attorney, defendants, Sherwood and Mack, breached their duties by failing to give the Pattons any advice about how the trusts would impact their children or whether other estate plans could also meet their objectives while increasing the amount their children would receive. Plaintiffs contend the individual defendants breached their fiduciary duties when they "refused" to be terminated as trustees of the CRUTs and continued to work on selling the Blaze to fund the CRUTs. Finally, they contend defendants breached their fiduciary duties when they copied Lowell's signature onto the altered documents.

Defendants contend they breached no fiduciary duties. Because the Pattons' funds were not used to pay any of their compensation, defendants contend they had no duty to disclose the amount of their compensation or how it was calculated. Defendants contend they provided competent estate planning and legal representation, that the trusts were consistent with the Pattons' estate planning goals, and that the documents were drafted within the applicable standards of care.

17

They further contend their conduct with respect to the Blaze was consistent with their fiduciary duties and did not proximately cause any damage to plaintiffs.

"The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086 (*Stanley*).) While the existence of a fiduciary duty is a question of law, which we review de novo, the question whether that duty has been breached is one of fact which we review for substantial evidence. (*Id.* at pp. 1086-1087; see also *Williamson, supra,* 7 Cal.App.5th at p. 1300.)

"A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accepts or assumes to accept the confidence, he or she may not act so as to take advantage of the other's interest without that person's knowledge or consent." (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101-1102.) Fiduciaries owe a "duty of undivided loyalty" to beneficiaries. (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 30.) Consequently, transactions between them will be ""closely scrutinized with the utmost strictness for any unfairness." . . .'" (*Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1141 (*Fair*).) Business transactions between a fiduciary and beneficiary are presumed to have been the product of undue influence. That presumption may be overcome by showing that the transaction was fair and just and that the beneficiary was fully advised about it. (*Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676, 684-685; see also *BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227-1228 (*BGJ*); Prob. Code, § 16004.)

We conclude, as did the trial court, that defendants Sherwood, Mack, Sorensen and ESI owed fiduciary duties to the Pattons because they acted as the Pattons' attorneys and/or estate planners. (*Fair, supra,* 195 Cal.App.4th 1135 at pp. 1140-1141.) We further conclude that substantial evidence supports the trial court's finding that these defendants did not breach their fiduciary duties.

First, ESI, Sorensen and Mack adequately disclosed that they would be compensated by the participating charities for their estate planning services.[9] Mack's engagement letter stated that he had been retained by ESI to prepare the Pattons' CRUTs and notes that the Pattons had also retained Sherwood. It further provided, "Mack PC understands that our fees, costs and expenses will be reimbursed by one or more charitable organizations through Estate Strategies."

ESI's engagement letter explained that fees and costs associated with preparing the Pattons' estate plan would be paid by the participating charities, so long as the estate plan met certain criteria. The principal criteria was that the estate plan would establish one or more irrevocable trusts in favor of the participating charities. ESI explained, "A charity incurs its own planned giving overhead, costs and fees (herein "Planned Giving Fees") in working with independent donors. In obtaining a charity's commitment to be a participating charity, [ESI] completes the charity's planned giving services, and, the charity reimburses [ESI] for the Planned Giving Fees saved." ESI disclosed that this compensation arrangement could create a conflict of interest between the Pattons and the charities,

---

[9] Sherwood required his fees to be paid directly by the Pattons.

"because it may be in the best interest of a charity to receive the largest possible remainder interest gift at the earliest date, on the other hand, it may be in your best interest to receive the greatest amount of income over the longest period of time." Mack's engagement letter included similar conflict disclosures.

ESI did not disclose the amount of the "Planned Giving Fees saved," it would be "reimbursed" by the participating charities or how that amount would be calculated.[10]  The charities paid ESI a percentage of the net present value of the charitable gifts it arranged.  These amounts were paid from the general funds of the charities themselves.  They were not paid from the Pattons' assets or with the Pattons' money, and did not reduce the amount of money placed in either the CRUTs or the Lead Trust.

The fiduciary duty of loyalty requires the fiduciary to behave fairly and justly toward the client and to provide the information required for the client to act with full knowledge of the relevant facts and full understanding of their effect.  (*BGJ, supra,* 113 Cal.App.4th at pp. 1227-1228; see also *Stanley, supra,* 35 Cal.App.4th at pp. 1089-1090.)  ESI, Sorensen and Mack satisfied that duty when they disclosed that their fees and costs would be reimbursed by participating charities, and that they would receive a percentage of the "planned giving fees saved" by the charities.  The engagement letters explained that the Pattons could pay fees and costs associated with creating an estate plan, or they could have others pay in exchange for irrevocable

---

[10] The trial court referred to these amounts as commissions. Plaintiffs refer to them as "kickbacks."  The trial court granted defendants' motion in limine to prohibit use of the term "kickback" at trial.

20

charitable donations. This gave the Pattons the information required to make an informed decision about how they wanted to proceed.

Defendants did not have a fiduciary duty to disclose the estimated amount they would ultimately be paid or how their compensation would be calculated because their compensation was paid by the charities' general funds, not the Pattons' gifts. Information about the calculation or amount of the fees had no impact on the fundamental decision the Pattons were asked to make: whether they wanted to pay for the estate planning themselves or make substantial gifts to charity in exchange for having those fees paid by the charities.

Plaintiffs protest that the commissions were a breach of fiduciary duty, even if the Pattons' money did not fund them, because the arrangement gave ESI, Sorensen and Mack a pecuniary interest adverse to the Pattons, in violation of Probate Code section 16004 and former California Rules of Professional Conduct 3-300 and 3-310.[11] But, as we explained above, defendants' engagement letters disclosed the potential conflict between the charities' interest in receiving the largest possible donation and any interest the Pattons had in making larger bequests to their children or others. Defendants did not acquire a pecuniary interest adverse to the Pattons because the charities had already agreed to compensate them for planned gifts. When

---

[11] California's Rules of Professional Conduct, which apply only to the attorneys, Mack and Sherwood, were reorganized and renumbered in November 1, 2018. The substance of former rules 3-300 and 3-310 is currently found in rules 1.7 (Conflict of Interest: Current Clients) and 1.8.1 (Business Transactions with a Client and Pecuniary Interests Adverse to a Client).

the Pattons agreed to establish the CRUTs, defendants' compensation was assured. Had the Pattons rejected the idea of charitable giving, defendants would have either charged the stated hourly rates for their services or declined the representation.

Plaintiffs contend defendants breached their fiduciary duties when they convinced the Pattons to create CRUTs without life insurance and when they created the lead trust because the trusts served no purpose other than to pay commissions to defendants. The trial court rejected this claim and credited the opinions of defendants' four expert witnesses. It concluded that defendants complied with the applicable standards of care in designing and documenting the Pattons' estate plan and in disclosing the terms of the trusts to the Pattons. Substantial evidence supports these findings.

Sherwood testified that he understood the Pattons wanted to ensure their children would receive an income stream from their estate rather than a lump sum inheritance. Mary Lou wanted the plan to be irrevocable to prevent Lowell from changing the bequests to their daughters after her death. Lowell was adamant that he would not pay legal fees, life insurance premiums or taxes. The couple also had a history of charitable giving, especially to their church and to the Santa Monica YMCA. The CRUTs and lead trust met these objectives. The CRUTs were irrevocable and produced an income stream for the beneficiaries. The lead trust reduced their gift and estate tax liability. Defendants' expert witness on charitable giving and planned gifts testified that it is not unusual for CRUTs to be funded without life insurance. Life insurance provides a lump sum pay out to the beneficiaries, which would have been

inconsistent with the Pattons' stated preferences. The Pattons also expressed a preference to minimize or avoid paying taxes on their estate. The CRUTs and lead trust were consistent with this preference because they generated tax deductions.

As the trial court noted, other estate plans might also have met the Pattons' objectives. The fact that defendants might have recommended other plans to meet some or all of the Pattons' goals does not establish they breached their fiduciary duties by recommending this one. (See, e.g., *Barner v. Leeds* (2000) 24 Cal.4th 676, 690; *Banerian v. O'Malley* (1974) 42 Cal.App.3d 604, 613.)

Plaintiffs contend defendants Sherwood and Mack breached their fiduciary duties when they continued their efforts to sell the Blaze even after Lowell attempted to terminate their appointments as management and administrative trustees in November 2003. As the trial court found, however, the Blaze was plagued by operational and managerial problems that reduced its value. Substantial evidence supports its finding that plaintiffs' estimate of the team's market value was not based on an appraisal or other evidence and that the $2.2 million sales price was the "only viable offer which came along in the two years that the team was being offered for sale."

One element of the cause of action for breach of fiduciary duty is that damages were proximately caused by the breach. (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1534; *Stanley, supra,* 35 Cal.App.4th at p. 1086.) Even assuming Sherwood and Mack were effectively terminated as trustees and that they breached a fiduciary duty by arranging the sale of the Blaze, plaintiffs failed to carry their burden to prove the breach proximately caused damage.

23

Plaintiffs contend Sherwood, Mack and Jack Patton breached their fiduciary duties because, in late 2004, they sold the Blaze franchise to the California League for $2.2 million when its fair market value was closer to $4 million. But plaintiffs never had the team appraised and no other evidence supported the $4 million estimate. An offer to purchase the team for $3.5 million was withdrawn after the prospective buyer reviewed the team's finances. Other offers failed because they relied on tax incentives that were not available, the construction of a new stadium or other financing terms the CRUTs could not meet. The team's financial records were in disarray. It had no stable source of funds to pay its operating expenses. The team was being sued by vendors of uniforms, caps, equipment, busses and hotel rooms and owed back taxes to both the state and federal governments. There was also a looming threat that the League would foreclose on the franchise itself for failure to pay league dues. This is substantial evidence supporting the trial court's finding that "the Blaze was sold to the California League for the only viable offer which came along in the two years that the team was being offered for sale."

Plaintiffs argue the sales price was too low because, in 2005, the California League sold the franchise to another buyer for $4 million. As the trial court noted, however, there was no evidence of the basis for the sales price. There was also no evidence of the franchise's financial condition in 2005 or the condition of its stadium and other facilities. The trial court did not err when it concluded plaintiffs failed to carry their burden to prove defendants breached fiduciary duties in connection with the sale of the Blaze.

Plaintiffs contend defendants breached fiduciary duties and demonstrated their intent to defraud the Pattons by "cutting and pasting" Lowell's signature onto the altered documents. The trial court declined to draw those inferences because it found, "There was conflicting evidence as to who was responsible for these cut and paste signatures. This was curiously left hanging without significant follow up. Plaintiffs did not meet their burden of proving a causal connection between these signatures and any damage allegedly sustained by Plaintiffs. As such, the court does not need to make findings as to the identity of the party responsible for these signatures."

Plaintiffs insist only Sherwood had a motive to alter the signatures on his engagement letters (Exhibits 23, 26, 43, 44 and 163) and that he and Jack together added Lowell's signature to the Unanimous Consent, to close the Blaze sale without Lowell's involvement. We are not convinced. The legal work described in the engagement letters was performed and paid for, apparently without any objection that Sherwood hadn't been retained for that work. As for the Unanimous Consent (Ex. 113), appellants failed to prove that Sherwood or Jack ever had access to the source document, Lowell's October 2003 power of attorney. Sherwood and Jack denied ever seeing the power of attorney before it was made public in February 2005. Sally testified she never provided a copy of it to either Sherwood or Jack.

Plaintiffs had the burden to prove these altered documents played a role in the alleged breaches of fiduciary duty, professional negligence or fraud. They did not because they did not carry their burden to prove who was responsible for the alterations or how the documents caused any of their alleged damages. Given these gaps in the evidence, the trial court

properly declined to rely on the altered documents to infer that any defendants intended to breach fiduciary duties toward, or to defraud the Pattons.

*Alleged Fraud by Concealment or Misrepresentation*

The elements of a cause of action for fraudulent concealment are "'(1) the defendant . . . concealed or suppressed a material fact, (2) the defendant [was] under a duty to disclose the fact to the plaintiff, (3) the defendant . . . intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff [was] unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.' [Citation.]" (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1130l see also *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.) Nondisclosure may constitute actionable fraud ""'(1) [W]hen the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts. . . .'"" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 859, quoting *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336; see also *American Trust Co. v. California Western States Life Ins. Co.* (1940) 15 Cal.2d 42, 65 ["one who does speak must speak the whole truth, and not by partial suppression or concealment make the utterance untruthful and misleading"].)

Plaintiffs contend defendants Mack, Sorensen, and ESI fraudulently concealed their compensation arrangements with the participating charities and did not disclose that they were steering the Pattons to contribute to those charities. The trial court found defendants had no duty to disclose their compensation arrangements because the charities, not the Pattons, paid for their services. It further found "there was no fraudulent conduct" by any of the defendants and "no misrepresentations of a material fact. Any misrepresentations alleged were not false, were non-actionable opinions, were mere projections or estimates with appropriate disclaimers, were not material, and/or were not reasonably relied upon."

For the reasons we have already stated, we conclude the trial court's legal conclusions are correct and that its findings of fact are supported by substantial evidence. Sorensen, Mack and ESI disclosed to the Pattons that participating charities would pay the fees and costs associated with creating their estate plan if the Pattons made substantial gifts to those charities. They further disclosed that their compensation would be based on the "planned giving fees saved" by the participating charities as a result of defendants' work. These disclosures gave the Pattons sufficient information to determine whether they wanted to proceed with an estate plan that was drafted at no cost to them but required them to make substantial gifts to charity. Defendants had no duty to disclose more specific terms of their compensation agreements with the preferred charities because the compensation was paid by the charities, not the Pattons.

Plaintiffs repeatedly refer to the compensation defendants received from the charities as a "kickback." This is inaccurate. *Arcturus Mfg. Corp. v. Rork* (1961) 198 Cal.App.2d

27

208, a case relied on by plaintiffs, provides a classic example of a kickback. There, Rork was employed by Arcturus to hire inspectors to certify Arcturus' products. Unbeknownst to Arcturus, Rork only hired inspectors who agreed to pay him a portion of the fee they received from Arcturus. That payment was a kickback. In affirming an order requiring Rork to repay these amounts, the court of appeal noted, "The duty of the agent to account to his principal for secret profits and kickbacks is fundamental." (*Id*. at p. 210.)

Defendants are not in the same position as Rork. They were paid by charities to arrange planned gifts to the charities. They performed that service by creating estate plans for clients like the Pattons and they informed the clients of their relationship with the charities. The "commissions" or "planned giving fees saved" are not kickbacks or secret profits because they are paid by the principal (the charities) to the agents (defendants) for services performed by the agents, not by a third party (e.g., the Pattons) as a fee for connecting that party with the principal.

Like the trial court, we are not convinced that any deceptive half-truths were told to, or material facts concealed from the Pattons. It is true the Pattons were not told how much money defendants were paid by the charities to arrange planned gifts. But the Pattons knew the charities were paying defendants and would foot the bill for their estate plan only if the Pattons made substantial gifts. Failure to disclose the amount ultimately paid to defendants was not fraud because that information does not alter the fundamental bargain presented to the Pattons.

28

*Alleged Elder Financial Abuse*

Plaintiffs alleged that defendants committed financial abuse of an elder adult within the meaning of Welfare & Institutions Code, section 15610.30 (hereafter, §15610.30) when they advised the Pattons to contribute the Blaze stock to the CRUTS and to contribute the 16th Street property to the lead trust and then accepted commissions from the charities based on the present value of those contributions. The trial court found there was no actionable elder abuse because defendants "did not breach the applicable standard of care in their dealings with the Pattons . . . ." Plaintiffs contend the trial court erred because the trusts served no purpose other than to generate commissions for defendants. In plaintiffs' view, defendants advised Lowell to transfer his property to the trusts for their own benefit, not his. We are not persuaded.

When the events at issue here occurred, section 15610.30 provided that financial abuse of an elder adult occurs when a person takes the property of an elder adult "to a wrongful use or with intent to defraud, or both." (Former §15610.30, subd. (a)(1).) Property is taken "to a wrongful use" when it is taken in "bad faith." (*Id.*, subd. (b).) A person acts in "bad faith" if "the person . . . knew or should have known that the elder . . . had the right to have the property transferred or made readily available to the elder . . . ." (*Id.*, subd. (b)(1).) Undisclosed commissions or finders fees arising from an abusive transaction may constitute financial abuse of an elder within the meaning of section 15610.30. (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 865 (*Mahan*); *Wood v. Jamison* (2008) 167 Cal.App.4th 156, 164-165 (*Wood*).)

29

Although section 15610.30 does not require proof of an intent to defraud, under both the former and current versions of the statute, it is still necessary to prove that a defendant took the elder's property for a "wrongful" use or with knowledge that the taking will deprive the elder of property to which he or she is otherwise entitled. (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 744-745; *Paslay v. State Farm General Ins. Co.* (2016) 248 Cal.App.4th 639, 656-657 (*Paslay*).) "[T]o establish a 'wrongful use' of property to which an elder has a contract right, the elder must demonstrate a breach of the contract, or other improper conduct." (*Paslay, supra,* at p. 657.)

The trial court correctly found that no financial elder abuse occurred. As we have discussed, the compensation paid to defendants was not a taking of the Pattons' property because it was not paid by the Pattons or with their assets.[12] Substantial evidence also established that respondents did not "take" the Pattons' property "to a wrongful use" or with an "intent to defraud" within the meaning of section 15610.30. The testimony of defendants' expert witnesses provided substantial evidence in support of the trial court's finding that the trusts were competently documented and consistent with the Pattons' intent to both make substantial gifts to charities and provide an income stream for their children. Transferring the Pattons' property to the trusts for the purpose of making charitable donations was not taking it "to a wrongful use" because the Pattons requested those

---

[12] *Mahan* and *Wood*, on which plaintiffs rely, are distinguishable for this reason, among many others. In both cases, the defendants were paid a commission or finders fee directly from the elder's assets. (*Mahan, supra,* 14 Cal.App.5th at p. 865; *Wood, supra,* 167 Cal.App.4th at p. 159.)

transfers and donations be made.  (*Paslay, supra,* 248 Cal.App.4th at p. 657; see also *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 527-578.)

*Alleged Professional Negligence*

"The elements of a cause of action for professional negligence are (1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis West*).)

Here, the trial court found defendants Sherwood, Mack, ESI and Sorensen acted within the standard of care for their respective professions.  Plaintiffs contend the trial court erred because their expert witness, Andrew Wallet, testified that defendants' conduct fell below the standard of care for many of the reasons we have already discussed.  But the trial court rejected Wallet's analysis and credited that of the defense experts.  In determining whether the judgment is supported by substantial evidence, we do not re-weigh conflicts and disputes in the evidence. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 596.)  The testimony of a single witness, including an expert witness or a party, may constitute substantial evidence. (*Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257; *Flores v. Liu* (2021) 60 Cal.App.5th 278, 296.)  The expert witness testimony credited by the trial constitutes substantial evidence in support of the judgment.

Plaintiffs contend Mack was negligent as a matter of law because, for a short period of time while he worked on the

31

Pattons' estate plan, he was not eligible to practice law because he failed to submit documentation that he complied with continuing legal education requirements. There is, however, no substantial evidence that Mack's temporary disability impacted the work he performed for the Pattons. Without evidence that Mack's temporary inability to practice law proximately caused damage to the Pattons, appellants cannot prevail on the cause of action for professional negligence. (*Oasis West, supra,* 51 Cal.4th at p. 820; *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 180-181.)

Plaintiffs also contend defendants were negligent because they allowed the Pattons to create irrevocable trusts without their informed consent. Again, however, the trial court rejected that contention when it found defendants acted within their respective standards of care in advising the Pattons about the features of the trusts and other aspects of their estate plan. Defendants' expert witnesses opined that the advice and information given to the Pattons complied with defendants' standard of care. Sherwood testified that he explained the trusts to the Pattons at face-to-face meetings and in a letter before the documents were finalized, and again while the Pattons were signing the documents. Sorensen also testified that he met with both of the Pattons to review the trusts and other aspects of their estate plan. During these meetings, Sorensen explained the trusts would be irrevocable, would make large gifts to charities and would provide income to the children. Sorensen also explained the trusts would not include life insurance. The notary, Jessica Hogan, testified that it was Sherwood's practice to explain documents to clients while they were being signed. She also remembered that it took the Pattons several hours to sign all

of their estate planning documents. This is substantial evidence supporting the trial court's conclusion that respondents obtained the Pattons' informed consent to create the CRUTs.

*Alleged Vicarious Liability of the Boy Scouts*

Plaintiffs' second amended complaint alleges that the Ventura County Council of Boy Scouts of America (VCC) is vicariously liable for torts committed by defendants Sorensen, Mack and ESI because they acted as agents of VCC in obtaining the Pattons' charitable gifts. The trial court granted VCC's motion for judgment under section 631.8 because it made the factual finding that respondents were not the agents of VCC. Plaintiffs contend the trial court erred. We conclude the trial court correctly granted VCC's motion for judgment because there is no substantial evidence that VCC had any authority to control defendants' actions. (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 620; *McCollum v. Friendly Hills Travel Center* (1985) 172 Cal.App.3d 83, 91.)

According to plaintiffs, VCC's liability is entirely derivative of defendants Sorensen, Mack and ESI. We have determined, however, that those defendants have no liability arising out of their dealings with the Pattons. It follows that VCC is also not liable to plaintiffs. Because there is no basis for VCC's vicarious or derivative liability, any error the trial court may have made in granting VCC's motion for judgment was not prejudicial. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107-1108.)

*Alleged Liability of Jack Patton*

Plaintiffs filed their original complaint in February 2006 and their second amended complaint in May 2012. In February 2013, plaintiffs filed an amendment to name Jack Patton as one of the Doe defendants. They allege Jack aided and

33

abetted Sherwood and Mack in defrauding and breaching fiduciary duties owed to the Pattons. They further alleged that Jack conspired with the other defendants, that he was in an agency relationship with them and that he was their alter ego.

Following the close of plaintiffs' case at trial, Jack moved for judgment under section 631.8. The trial court granted the motion, reasoning that the Doe amendment was untimely and that, "on a substantive basis, there is no evidence that [Jack] participated in the preparation of the estate plan," in a conspiracy to harm his father or siblings, or that he had mismanaged the Blaze baseball team.

Plaintiffs contend the trial court erred. First, they contend their Doe amendment was timely because they did not have actual knowledge that Jack altered documents related to the sale of the Blaze until those documents were produced in the probate case, in November 2012. Second, they contend there was substantial evidence that Jack assisted Sherwood in selling the Blaze without Lowell's consent. The judge in Jack's will contest case factually found that Jack altered documents required to sell the Blaze and that he intentionally concealed the sale of the team from Lowell. Plaintiffs contend the trial court erred when it granted defendants' motion in limine and excluded findings made by the court after the will contest trial. They further contend collateral estoppel bars Jack from denying that he created the photocopied signatures and used the altered documents to sell the Blaze behind Lowell's back.

"The substantial evidence standard of review applies to judgment given under Code of Civil Procedure section 631.8; the trial court's grant of the motion will not be reversed if its findings are supported by substantial evidence. [Citation.]

34

Because section 631.8 authorizes the trial court to weigh evidence and make findings, the court may refuse to believe witnesses and draw conclusions at odds with expert opinion. [Citation.]" (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549-550.) Here, in addition to finding the Doe amendment untimely, the trial court factually found there was no substantial evidence that Jack "participated in the preparation of the estate plan," that "he was involved in a conspiracy," or that "he ran the Blaze into the ground . . . ." In reaching these conclusions, the trial court credited defendants' evidence that Jack was not involved in the estate planning, that Lowell and Mary Lou consented to the incorporation of the Blaze and that Jack, as a corporate officer, had authority to sell the team.

The record supports the trial court's conclusion. Plaintiffs introduced no evidence supporting their allegation that Jack conspired with the other defendants, that he had an agency relationship with them, or that he was their alter ego. He denied any involvement in creating the 2002 estate plan, in the Pattons' decision to incorporate the Blaze or in their decision to distribute 60% of the Blaze shares to Jack's CRUT. Plaintiffs introduced no evidence to the contrary.[13] Finally, we have already determined that the remaining defendants did not defraud the Pattons, breach their fiduciary duties or engage in financial elder abuse.

_____

[13] Plaintiffs' opening brief insists that "Sorensen recruited Jack to assist in the fraud on his parents," and that Jack both "despised his father" and "played an integral role in getting documents signed by Lowell." These statements are unsupported by any citation to the record. Similarly unsupported is appellants' assertion, made most directly in their reply brief, that Jack was responsible for "forg[ing]" or "fabricat[ing]" documents relating to the sale of the Blaze.

Because they have no liability to plaintiffs, Jack has no derivative liability. The trial court did not err when it granted Jack's motion for judgment.

*Section 998 Costs*

In April 2014, the trial court denied defendants' motions for summary judgment or summary adjudication. Twelve days later, defendants ESI and Sorensen made a statutory offer to compromise for $350,000. (§998.) Mack made a section 998 offer of $50,000 and Sherwood made an offer of $45,000. Plaintiffs rejected each offer. After trial, the trial court awarded ESI and Sorensen expert witness fees of $148,887.90. It awarded Mack expert witness fees of $50,938.21, and Sherwood was awarded expert witness fees of $16,300. Plaintiffs contend the trial court erred because the offers were only "tokens," and were not made in good faith.

"A prevailing party who has made a valid pretrial offer pursuant to . . . section 998 is eligible for specified costs, so long as the offer was reasonable and made in good faith." (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134.) Whether an offer was reasonable and made in good faith "is a matter left to the sound discretion of the trial court." (*Elrod v. Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 700 (*Elrod*).) When a party obtains a judgment more favorable than its offer, the offer "is presumed to have been reasonable and the opposing party bears the burden of showing otherwise." (*Thompson v. Miller* (2003) 112 Cal.App.4th 327, 338-339 (*Thompson*).)

Here, the trial court found in favor of defendants and against plaintiffs on each of plaintiffs' causes of action. This supports the trial court's finding that defendants' offers were reasonable. (*Thompson, supra,* 112 Cal.App.4th at pp. 338-339;

36

see also *Elrod, supra,* 195 Cal.App.3d at p. 700 ["Where, as here, the offeror obtains a judgment more favorable than its offer, the judgment constitutes prima facie evidence showing the offer was reasonable and the offeror is eligible for costs as specified in section 998"].)

Plaintiffs contend they reasonably rejected the offers because the offers were made days after the trial court denied defendants' motions for summary judgment. But the order denying summary judgment was not a determination that plaintiffs' legal theories had merit. (See, e.g., *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 824.) Rather, the trial court denied the motions because it concluded that defendants did not "conclusively negate" every theory of damages asserted by plaintiffs and that triable issues of fact remained to be resolved.

Although plaintiffs estimated their potential recovery was in the millions, they also had to realize there was a chance they would not prevail at trial, exposing them to liability for substantial costs. Accepting the offers to compromise would have eliminated that exposure and delivered plaintiffs at least a partial recovery. (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1264.) The trial court considered these factors, as well as the state of the evidence when the offers were made. We conclude it did not abuse its discretion in awarding defendants their expert witness fess under section 998.

*Cost of Proof Sanctions*

ESI and Sorensen propounded identical sets of requests for admission (RFAs) to plaintiffs. Each set of 32 RFAs asked plaintiffs to admit facts or legal conclusions such as: defendants never made false representations to plaintiffs; defendants did not owe a fiduciary duty to plaintiffs or breach

37

any such duty; defendants did not fail to disclose any important fact known only to them and not to plaintiffs; defendants never took any of plaintiffs' property; defendants were not negligent; and defendants' actions were not a substantial factor in causing harm to plaintiffs. Plaintiffs denied each RFA.

After defendants prevailed at trial, the trial court granted them $1,000,981.50 in cost of proof sanctions because it concluded plaintiffs had no reasonable basis for the denials when they were made. Plaintiffs contend the trial court erred because their denials were reasonable, because the RFAs improperly sought conclusions of law or conclusions based on facts they were not requested to admit, and because defendants provided no evidence of the costs they incurred to prove each fact.

"When a party propounds requests for admission of the truth of certain facts and the responding party denies the requests, if the propounding party proves the truth of those facts at trial, he or she may seek an award of the reasonable costs and attorney fees incurred in proving those facts. [Citation.] The court is required to award those costs and fees unless it finds the party who denied the requests 'had reasonable ground to believe [he or she] would prevail on the matter' or '[t]here was other good reason for the failure to admit.' [Citation.]" (*Grace v. Mansourian* (2015) 240 Cal.App.4th 523, 529 (*Grace*).)

An RFA may relate to a "controversial matter, or one involving complex facts," or call for a legal conclusion. (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 752.) "In evaluating whether a 'good reason' exists for denying a request to admit, 'a court may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at

38

trial.' [Citation.]" (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1276.)  We review the trial court's determination that costs of proof should be awarded for abuse of discretion.  (*Grace, supra,* 240 Cal.App.4th at p. 529.)

Plaintiffs note that, in 2014, the trial court denied defendants' motions for summary judgment after finding disputed issues of material fact remained to be resolved on each cause of action.  They contend these findings demonstrate they had a reasonable basis for denying the RFAs in 2009.  The trial court rejected that reasoning, finding instead that, "There is no evidence offered as to why [plaintiffs] thought their denials to be reasonable when they made them in 2009."

Plaintiffs' basis for denying the RFAs in 2009 was the same as their basis for opposing the motions for summary judgment in 2014 and for trying the case in 2017.  Throughout this litigation, they have consistently maintained that defendants had a duty to disclose their relationships with, and the compensation they received from the participating charities, and that they convinced the Pattons to create the trusts in order to enrich themselves and not to benefit the Pattons.  Although plaintiffs ultimately failed to carry their burden of proof on the factual issues, their case was not without an evidentiary basis.  It relied on the illustrations defendants provided to the Pattons, correspondence between the parties and the trust documents themselves.  They also had qualified expert witnesses who supported their claims.

Plaintiffs were unsuccessful at trial.  But, that is not the same thing as having acted unreasonably or in bad faith. (*Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 130-132 [reasonable basis to deny RFAs shown

where responding party later defeated propounding party's motion for summary judgment and presented evidence at trial to contest each RFA]; *Orange County Water Dist. v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96, 116 ["expert opinion evidence may provide a party with a reasonable ground to believe it will prevail on a matter covered by an RFA"].) We conclude the trial court erred in awarding cost of proof sanctions.

*ESI's Cross-Appeal for*

*Contractual Attorney Fees*

The engagement letter between ESI, Sorensen and the Pattons included an attorneys fee clause that provides, "The prevailing Party in any proceeding to enforce any provision of this Agreement shall be awarded reasonable attorney's fees and costs incurred in the proceeding . . . ." After prevailing at trial, ESI moved for an award of contract-based attorneys fees of $1,988,383.50. The trial court denied the motion concluding the attorney fee provision at issue here was not broad enough to encompass appellants' tort claims. ESI contends the trial court erred because, although plaintiffs did not allege a cause of action for breach of contract, their tort causes of action all arose out of the Pattons' contractual relationship with ESI.

"The issue of a party's entitlement to attorney fees is a legal issue subject to de novo review. [Citations.] . . . The normal rules of appellate review apply to an order granting or denying attorney fees; i.e., the order is presumed correct, all intendments and presumptions are indulged to support the order, conflicts in the evidence are resolved in favor of the prevailing party, and the trial court's resolution of factual disputes is conclusive. [Citation.]" (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1016–1017.)

40

"[A] broadly phrased contractual attorney fee provision may support an award to the prevailing party in a tort action." (*Gil v. Mansano* (2004) 121 Cal.App.4th 739, 743 (*Gil*).) Where the action involves tort claims, "the question of whether to award attorneys' fees turns on the language of the contractual attorneys' fee provision, i.e., whether . . . the type of claim is within the scope of the provision." (*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 708 (*Exxess Electronixx*).)

"Where, as here, there is no conflicting extrinsic evidence, we independently review the trial court's interpretation of the attorney fees clause. [Citation.] A 'contract containing . . . attorney fees provisions must be analyzed on its own terms, and in context, pursuant to the usual rules of contract interpretation for determining the actual intent of the parties. [Citations.]' [Citation.]" (*GoTek Energy, Inc. v. SoCal IP Law Group, LLP* (2016) 3 Cal.App.5th 1240, 1248–1249 (*GoTek Energy*).)

We agree with the trial court that the attorney fees provision at issue here does not apply to plaintiffs' tort claims. It is not broadly phrased to authorize an award of fees in any action "arising out of" the engagement letter, or in any "dispute . . . relating to" it. (See, e.g., *Santisas v. Goodin* (1998) 17 Cal.4th 599, 607-608 (*Santisas*) [provision authorizing attorney fee award in legal action "arising out of the execution of this agreement" broad enough to support an award of fees in action alleging both contract and tort claims]; *GoTek Energy, supra,* 3 Cal.App.5th at pp. 1248-1249 [provision authorizing fee award in "'any dispute between us relating to this agreement . . .'" applied to legal malpractice claim]; *Siligo v. Castellucci* (1994) 21 Cal.App.4th 873, 878, fn. 5 [agreement allowing attorney fees in "'any action

41

or proceeding arising out of this [a]greement'" applies to fraud claim].)

Instead, the provision is drafted more narrowly, to authorize an award of attorney fees "in any proceeding to enforce any provision of this Agreement . . . ." "[A] tort claim does not 'enforce' a contract." (*Exxess Electronixx, supra,* 64 Cal.App.4th at p. 709.) Thus, a contractual attorneys fees provision that authorizes a fee award only in an action to "enforce" the terms of the contract does not encompass tort claims, including claims for fraud or negligence. (See, e.g., *Santisas, supra* 17 Cal.4th at p. 622, fn. 9; *Gil, supra,* 121 Cal.App.4th at p. 745 [provision allowing fees in an action to enforce a release does not apply to fraud claim].) The trial court correctly denied the motion for attorney fees.

*Disposition*

The order awarding cost of proof sanctions pursuant to section 2033.420 to ESI and Sorensen is reversed. In all other respects, the judgment is affirmed. Defendants shall recover their costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P. J.


BALTODANO, J.

42

Henry Walsh, Judge

Superior Court County of Ventura

_____


Smith Law Firm and Craig Smith, for Plaintiffs and Appellants.

Nemecek & Cole, Frank W. Nemecek, Jonathan B. Cole, Mark Schaeffer, Jon D. Robinson, for Defendants and Appellants.

Young Wooldridge and Robert J. Noriega, for Defendant and Respondent, Jack Patton.

Matthew B. Mack, for Defendants and Respondents, Matthew B. Mack, Matthew B. Mack Counselor at Law and Matthew B. Mack, A Professional Corp.

Law Offices of Greg May and Greg May; Jones & Lester and Mark A. Lester, for Defendant and Respondent, Ventura County Council of the Boy Scouts of America.

Monroy, Averbuck & Gysler and Jon F. Monroy, for Defendant and Respondent, Mark Sherwood.